Baljinder S. **MATHARU** and Jessica A. Matharu, Individually and as Administrators of the Estate of Milan Singh Matharu, Deceased, Appellees

v.

Scott D. **MUIR**, D.O., Fiorina Pellegrino, D.O., Hazleton Women's Care Center and Muir Ob/Gyn Associates, P.C., Appellants.

Superior Court of Pennsylvania.

Argued Nov. 18, 2010.

Filed Feb. 21, 2014.

Aaron S. Jayman, Camp Hill, for appellants.

Timothy A. Shollenberger, Enola, for appellees.

BEFORE: FORD ELLIOTT, P.J., MUSMANNO *, BENDER, BOWES, DONOHUE, SHOGAN, ALLEN, OLSON and OTT, JJ.

## OPINION BY DONOHUE, J.:

Scott D. Muir, D.O. ("Dr. Muir"), Fiorina Pellegrino, D.O. ("Dr. Pellegrino"), Hazelton Women's Care Center ("Hazelton") and Muir OB/GYN Associates, P.C. ("Muir Associates") (collectively, "Appellants") appeal from the order denying, in part, their motion for the entry of summary judgment against Baljinder S. Matharu ("Father") and Jessica A. Matharu ("Mother"), individually and as Administrators of the Estate of Milan Singh Matharu ("Child") (collectively, "Appellees"). This Court previously affirmed the trial court's order in an *en banc* decision dated June 28, 2011. On August 22, 2013, the Supreme Court of Pennsylvania vacated this decision and remanded the case to this Court for reconsideration in light of its decision in *Seebold v. Prison Health Serv.*, 618 Pa. 632, 57 A.3d 1232 (2012). For the reasons set forth herein, we conclude that this case is distinguishable from *Seebold.* Accordingly, we again affirm the trial court's order.

In its written opinion, the trial court aptly summarized the relevant and undisputed factual background of this case:

1. The instant wrongful death/survival action was instituted by summons on April 25, 2007, followed by a Complaint on June 26, 2007.

2. An Answer and New Matter was filed by [Appellants] on October 4, 2007.

3. [Mother] gave birth to her first child [S.M.] on February 21, 1997.

4. [Mother's] pre-natal care for [S.M.] was rendered by a physician other than [Appellants] herein.

5. Blood work during the 1997 pregnancy indicated [that Mother] was Rh-negative.[FN].

[FN] The designation of Rh-negative blood is relevant because of the potential effect it has on future pregnancies. Where a mother's blood is Rh-negative and the father's blood is Rh-positive, a child can be conceived who is Rh-positive. Although the mother's and baby's bloodstream is [*sic*] separate, the baby's Rh-positive blood could enter the mother's system, causing the mother to create antibodies against the Rh factor and to treat the baby like an intruder. Under these conditions, the mother is said to be sensitized or iso-immunized. To prevent this, the mother is given an injection of Rh immunoglobulin known as RhoGAM at 28 weeks [of] gestation and again within 72 hours after birth if the baby is determined to be Rh-positive.

6. [Father] was determined in 1997 to be Rh-positive.

7. After [the] delivery of [S.M., Mother] was administered RhoGAM (Rh immunoglobulin).

8. In 1997, [Mother] was aware that she was Rh-negative and that she had been administered RhoGAM.

9. In 1998, [Mother] became pregnant again, and in May, 1998, came under the care of [ ] Dr. Muir and Dr. Pellegrino, at [ ] Hazleton Women's Care Center.

10. [Mother] was again found to be Rh-negative during this second pregnancy.

* Judge Musmanno did not participate in the consideration or decision of this case.

11. [Mother] was not given an injection of RhoGAM at 28 weeks [of] gestation on the second pregnancy.

12. [Mother] delivered her second child [Sandeep] on October 3, 1998.

13. [Mother] did not receive an injection of RhoGAM within 72 hours of this birth.

14. Following the birth of [Sandeep] and while [Mother] was still in the hospital, [Dr.] Muir told both [Mother and Father] that no RhoGAM had been administered to [Mother] and that she had become sensitized during the third trimester.

15. The discharge summary evidences a conversation between [Dr.] Muir and [Mother and Father] regarding the ramifications of Rh sensitization, including the effects on an unborn fetus. It further indicates that [Mother and Father] stated [that] they desired no more children. [Mother] was advised to seek early prenatal care at the next pregnancy.[FN]

[FN] Failing to administer RhoGAM is relevant because of the harmful effect it can have on future pregnancies.

16. Within a few weeks of [Sandeep's] birth, [Mother and Father] contacted a law firm[,] which sought to obtain a copy of [Dr.] Muir's medical chart on [Mother].

17. After consultation with a lawyer, and within two (2) years of [Sandeep's] birth, [Mother and Father] did not file a lawsuit regarding the failure to administer RhoGAM.

18. In 2000, [Mother] became pregnant again, but underwent an abortion at Allentown Women's Center. [None of the Appellants] provided any care or treatment for this pregnancy.

19. [Mother] did not receive RhoGAM at the time of her 2000 abortion.

20. In late 2001, [Mother] became pregnant a fourth time. She telephoned [Dr.] Muir and had a discussion with him regarding this pregnancy and her sensitization.

21. [Mother] returned to the care of [Appellants] on March 12, 200[2], at 14.3 weeks [of] gestation. [Dr.] Muir sent [Mother] to Lehigh Valley Hospital for consultation in the Department of Maternal Fetal Medicine.

22. On August 6, 2002, [Mother] gave birth to her fourth child, [M.], at Lehigh Valley Hospital.

23. The last chart note of any contact between [Mother] and [Appellants'] office is a call by [Mother] on July 29, 2002.

24. [Mother's] last office visit with [Appellants] was [on] July 8, 2002.

25. [Mother] never presented for a follow-up [postpartum] visit with [Appellants] after the birth of [M.].

26. Subsequent to this birth, [Dr.] Muir sent [Mother] a letter requesting her to schedule a post-partum appointment.

27. In and around March, 2003, after receiving no response, [Dr.] Muir sent a certified letter to [Mother] dismissing her from his practice. The letter was signed for and received by [Mother] on March 15, 2003.

28. As of March 15, 2003, [Mother] was no longer a patient of [Appellants] and no longer had a doctor-patient relationship with [Appellants].

29. [Mother] suffered a miscarriage early in her fifth pregnancy on January 23, 2005.

30. In mid[-]2005, [Mother] became pregnant for a sixth time.

31. [Mother] did not consult [Appellants], and [Appellants] provided no care or treatment during this sixth pregnan-

cy. No doctor-patient relationship was formed between [Mother] and [Appellants] during this sixth pregnancy.

32. For this sixth pregnancy in 2005, [Mother] received her pre-natal care from Dr. Vourtsin and the Department of Maternal Fetal Medicine at Lehigh Valley Hospital.

33. During this sixth pregnancy, [Mother] knew she was iso-immunized and that there were certain risks associated with pregnancy.

34. [Mother] became aware that she had become iso-immunized in October, 1998, after the birth of her second child, [S.].

35. [Mother's] sixth pregnancy proceeded without complication until November, 2005, or 26 weeks [of] gestation.

36. In late October, 2005, fetal blood work showed anemia, so [Mother] underwent intraperitoneal transfusion.

37. On November 10, 2005, [Mother] returned to Lehigh Valley Hospital. While undergoing a PUBS procedure with intrauterine transfusion (percutaneous umbilical blood sampling), [Child's] heart rate became non-reassuring and abruption was suspected.

38. An emergency C-section was performed on November 10, 2005. [Milan Matharu] was born and then transferred to Children's Hospital of Philadelphia, where he died two days later.

In addition to the foregoing chronological undisputed facts, it is relevant to point out that the parties do agree that the negligence[,] which forms the basis for this lawsuit[,] occurred in 1998[,] when [Dr.] Muir failed to administer RhoGAM during [Mother's] second pregnancy at 28 weeks or after the delivery of [Sandeep].[FN]

[FN] Plaintiffs claim that [Appellants] failed to administer RhoGAM, failed to take an ade-

quate history to determine the blood type of [Father], and failed to take an adequate history of [Mother] to determine if she had been administered a RhoGAM injection within 72 hours of her prior delivery.

Trial Court Opinion, 2/20/09, at 1–5 (footnotes in original).

After the completion of discovery, Appellants filed a motion for summary judgment. In an order dated February 20, 2009, the trial court granted the portion of the motion contending that Pennsylvania law does not allow a parent to recover for the loss of a child's consortium, but denied Appellants' demand for dismissal of Appellees' wrongful death and survival actions. Trial Court Order, 2/20/2009, at ¶¶ 1–2. On March 2, 2009, the trial court amended its order, adding that its decision involved a controlling question of law as to which there is a substantial ground for difference of opinion "and that an immediate appeal from the order may materially advance the ultimate termination of the matter." Trial Court Order, 3/2/2009, at ¶ 4.

On May 1, 2009, this Court granted Appellants' petition for permission to appeal. After oral argument before a three-judge panel, we determined that the case should be decided by the Court sitting *en banc*. On June 28, 2011, we issued an *en banc* order and decision affirming the trial court's March 2, 2009 order. *Matharu v. Muir*, 29 A.3d 375 (Pa.Super.2011) (*en banc*), *vacated*, —— Pa. ——, 73 A.3d 576 (2013). On August 22, 2013, the Supreme Court of Pennsylvania granted Appellants' petition for allowance of appeal, vacated our decision and order, and remanded the case to this Court "for reconsideration in light of *Seebold v. Prison Health Serv.*, 618 Pa. 632, 57 A.3d 1232 (2012)." *Matharu v. Muir*, —— Pa. ——, 73 A.3d 576 (2013). In response, this Court ordered the parties to file supplemental briefs, which the parties completed on December 10, 2013.

On remand, Appellants present the following two issues for our consideration and determination:

I. Whether the trial court and this Court created a new duty by a physician to a third party with whom the physician has no physician-patient relationship at the time of the alleged negligence[,] contrary to *Seebold v. Prison Health Serv.* [618 Pa. 632] 57 A.3d 1232 (Pa.2012) and long standing Pennsylvania jurisprudence?

II. Whether a newly created duty for a physician to a third party with whom the physician has no physician-patient relationship, contrary to *Seebold v. Prison Health Serv.* [618 Pa. 632] 57 A.3d 1232 (Pa.2012) and long standing Pennsylvania jurisprudence, circumvents the Medical Care Availability and Reduction of Error (MCARE) Act's statute of repose to permit Appellees' claims?

Appellants' Brief on Remand at 5.

Our standard of review with respect to a trial court's decision to grant or deny a motion for summary judgment is as follows:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*JP Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258, 1261–62 (Pa.Super.2013) (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 590, 777 A.2d 418, 429 (2001)).

With respect to Appellants' first issue on remand, we begin with a detailed review of the *Seebold* case. Michelle Seebold ("Seebold") filed suit against Prison Health Services, Inc. ("PHS"), a company providing medical services at the state correctional institution at Muncy, Pennsylvania, pursuant to a contract with the Pennsylvania Department of Corrections. *Seebold*, 618 Pa. at 634, 57 A.3d at 1234. Seebold worked as a corrections officer at the prison and was assigned to strip search its female inmates before and after they received visitors. *Id.* According to Seebold's complaint, approximately twelve inmates contracted a contagious bacterial infection known as methicillin-resistant staphylococcus aureus ("MRSA"). *Id.* Seebold alleged that PHS doctors misdiagnosed the condition as spider bites. As a result of the misdiagnosis, the prison took no precautions against the spread of the infection and Seebold contracted MRSA. *Id.* Seebold averred that PHS's physicians owed a duty of reasonable care to the staff and inmates at the prison to warn and protect them from acquiring an MRSA infection,

and breached this duty by failing to, *inter alia,* advise the prison staff on how to avoid acquiring MRSA, including when conducting a strip search of an inmate infected with MRSA. *Id.*

The trial court granted PHS's preliminary objections to Seebold's complaint, finding that PHS physicians had no affirmative duty to Seebold as a third-party non-patient. *Id.* In a Memorandum decision dated December 1, 2009, this Court vacated the trial court's ruling, concluding that PHS physicians owed a duty to Seebold pursuant to section 324A of the Restatement (Second) of Torts, which provides as follows:

§ 324A **Liability to Third Person for Negligent Performance of Undertaking**

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS, § 324A.

In so ruling, this Court relied primarily on two cases, *DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422 (1990) and *Troxel v. A.I. Dupont Institute,* 450 Pa.Super. 71, 675 A.2d 314 (1996), *appeal denied,* 546 Pa. 668, 685 A.2d 547 (1996). In *DiMarco,* our Supreme Court addressed "the issue of whether a physician owes a duty of care to a third party where the physician fails to properly advise a patient who has been exposed to a communicable disease, and the patient, relying upon the advice, spreads the disease to the third party." *DiMarco,* 525 at 559, 583 A.2d at 423. The plaintiff's girlfriend was a blood technician who was accidentally exposed to hepatitis B in the course of her employment. The defendant doctors informed her that if she remained symptom free for six weeks following exposure, then she had not contracted the virus. *Id.* Accordingly, the doctors advised her to refrain from sexual activity for six weeks. *Id.* The plaintiff and his girlfriend abstained from sex for eight weeks, but were both subsequently diagnosed with hepatitis B. *Id.* at 560, 583 A.2d at 423. The plaintiff filed suit against the girlfriend's physicians, alleging that they violated a duty of care to him in failing to advise his girlfriend about precautions necessary to avoid spreading hepatitis to others. Specifically, the plaintiff alleged that the doctors should have advised his girlfriend that she could spread hepatitis through sexual contact for up to six months after her exposure. *Id.*

Our Supreme Court reasoned as follows: When a physician treats a patient who has been exposed to or who has contracted a communicable and/or contagious disease, it is imperative that the physician give his or her patient the proper advice about preventing the spread of the disease. Communicable diseases are so named because they are readily spread from person to person. Physicians are the first line of defense against the spread of communicable diseases, because physicians know what measures must be taken to prevent the infection of others. The patient must be advised to take certain sanitary measures, or to remain quarantined for a

period of time, or to practice sexual abstinence or what is commonly referred to as 'safe sex.'

Such precautions are taken not to protect the health of the patient, whose well-being has already been compromised, rather such precautions are taken to safeguard the health of others. Thus, the duty of a physician in such circumstances extends to those within the foreseeable orbit of risk of harm. If a third person is in that class of persons whose health is likely to be threatened by the patient, and if erroneous advice is given to that patient to the ultimate detriment of the third person, the third person has a cause of action against the physician, because the physician should recognize that the services rendered to the patient are necessary for the protection of the third person.

*Id.* at 562, 583 A.2d at 424–25.

This Court applied the Supreme Court's *DiMarco* decision in *Troxel*. In that case, the plaintiff's friend and the friend's baby suffered from a contagious disease known as cytomegalovirus ("CMV"). *Troxel*, 675 A.2d at 316. The plaintiff frequently visited her friend and her friend's baby during the plaintiff's pregnancy, not knowing that both suffered from CMV. *Id.* Subsequently, the plaintiff contracted CMV and the plaintiff's baby died from the disease several months after his birth. *Id.* The plaintiff sued her friend's doctor for failing to advise the friend regarding the risk of spreading CMV. *Id.*

In *Troxel*, this Court concluded that the plaintiff "has stated a cause of action, pursuant to Section 324A, even though there was no physician-patient relationship between [the plaintiff] and [her friend's] physicians." *Id.* at 318. We noted that our Supreme Court has "recognized that the essential provisions of Section 324A 'have been the law of Pennsylvania for many

years.'" *Id.* (quoting *Cantwell v. Allegheny County*, 506 Pa. 35, 483 A.2d 1350 (1984)). We disagreed with the suggestion that liability under Section 324A would render physicians liable for the spread of any infectious disease, like the common cold or the flu, concluding that where certain medical risks "may only be known within the medical community, it is essential that correct information be disseminated by the physician." *Id.* at 323.

In addition to *DiMarco* and *Troxel*, we also observed that our Supreme Court had recognized one additional circumstance wherein a health care provider owes a duty of care to third parties. In *Emerich v. Philadelphia Center for Human Development, Inc.*, 554 Pa. 209, 720 A.2d 1032 (1998), our Supreme Court, relying in part on *DiMarco*, held that a therapist had a duty to warn his patient's intended victim of the patient's stated intent to kill the victim. *Id.* at 226, 720 A.2d at 1040. The Supreme Court was careful, however, to limit this duty to cases involving a "specific and immediate threat of serious bodily injury" against a "specifically identified or readily identifiable victim." *Id.*

In our decision in *Seebold*, we recognized a difference between the facts of the case and those in *DiMarco* and *Troxel*, as Seebold alleged that the PHS physicians had failed to diagnose MRSA and thus had not provided any advice to anyone regarding the spread of the condition. *DiMarco* and *Troxel*, by comparison, did not involve a misdiagnosis but rather bad advice (*DiMarco*) or no advice at all (*Troxel*). We concluded that this distinction was not controlling:

> PHS's alleged negligent failure to diagnose twelve cases of MRSA in inmates does not insulate PHS from its resulting failure to take steps to prevent further spreading of the disease within the prison. *Troxel* establishes that a cause of

action exists whether the health care provider gives the patient incorrect advice or no advice at all. Furthermore, Seebold's complaint makes clear that she relied upon the diagnosis of the inmates' skin condition as spider bites. Thus, Seebold's complaint alleges both misfeasance by PHS and her reliance upon it.

*Seebold v. Prison Health Serv.*, 20 MDA 2009 at 12–13, 990 A.2d 66 (Pa.Super. December 1, 2009) (unpublished memorandum). Accordingly, we held that Seebold had stated a cause of action against PHS pursuant to Section 324A of the Second Restatement, concluding that Seebold was "among a narrow class of highly foreseeable plaintiffs." *Id.* at 13, 16. We expressly recognized that *DiMarco* and *Troxel* ruled that physicians must provide accurate advice to **their patients,** rather than to third-party plaintiffs (which could result in a violation of a patient's right to confidentiality). *Id.* at 15. In this regard, we made clear that "nothing in our holding should be construed as requiring a healthcare provider to violate any applicable legal or ethical obligation," and declined to speculate "in the absence of a developed factual record, as to precisely what measures could have been taken in this case—in the context of a prison environment—consistent with PHS's regulatory and ethical obligations." *Id.* at 15–16.

In an Opinion dated December 28, 2012, our Supreme Court reversed and remanded,[1] holding that PHS's physicians had no duty to warn Seebold that prison inmates had a communicable disease. *Seebold,* 618 Pa. at 661–63, 57 A.3d at 1250–51. The Supreme Court took no issue with this Court's determination that the negligent failure to diagnose the MRSA infection

was not fatal to a third-party claim under Section 324A. *Id.* at 641, 57 A.3d at 1238 n. 6. Instead, the Supreme Court granted allowance of appeal to address "the salient question concerning whether this Court should impose a new, affirmative duty upon physicians to warn and advise third-party non-patients in the factual context implicated by [PHS's] circumstances." *Id.* at 643, 57 A.3d at 1239.

In addressing the issue of whether physicians have a common law duty to take affirmative measures outside of the physician-patient relationship, the Supreme Court recognized a clear difference between the factual circumstances presented in *Seebold* versus those presented in *DiMarco* and *Troxel.* In *DiMarco* and *Troxel,* the courts delineated a physician's duty to protect third-party non-patients by advising their patients properly. *Id.* at 649, 57 A.3d at 1243. According to the Supreme Court, "there is a patent, material difference between providing advice to a patient within the contours of a confidential physician-patient relationship and disclosing protected medical information to third-party non-patients." *Id.* While *DiMarco* and *Troxel* permitted third-party non-patients to bring suit against physicians, they did so based upon the physician's failure to advise the patient properly. *DiMarco* and *Troxel* did not, however, require the physicians in those cases "to undertake interventions outside the confidential physician-patient relationship." *Id.* Interventions with third-party non-patients have been required only in the very limited circumstances described in *Emerich,* namely where there is a targeted threat of imminent violence. *Id.*

For these reasons, the Supreme Court in *Seebold* concluded that the plaintiff had

---

1. In accordance with the Supreme Court's directive, on March 15, 2013, this Court affirmed the trial court's order. *Seebold v. Pris-* *on Health Serv.*, 20 MDA 2009, 69 A.3d 1289 (Pa.Super. March 15, 2013) (unpublished memorandum).

not stated a cause of action pursuant to Section 324A of the Second Restatement in accordance with *DiMarco* and *Troxel.* The Court declined to fashion a new duty on physicians to intervene with at-risk third party non-patients, concluding that the legislature, rather than the courts, is best suited to make such policy decisions. *Id.* at 652–53, 57 A.3d at 1245. In this regard, the Court reiterated that its default position is not to impose new affirmative duties "unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating." *Id.; see generally Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166 (2000).

Based upon our careful review of *Seebold,* we conclude that the present case is distinguishable and that our decision to affirm the trial court's denial (in part) of Appellants' motion for summary judgment should stand. In particular, in this case the alleged negligence (the failure to administer RhoGAM) occurred *within the confines of the physician-patient relationship,* and the averments of Appellees' complaint do not assert any failure to intervene with a third party. Instead, we remain convinced that this case asserts a duty created pursuant to Section 324A of the Second Restatement as expressly recognized in *DiMarco* and *Troxel.*

▆ To state a cause of action under Section 324A of the Second Restatement, a plaintiff must aver that the physician has undertaken "to render services to another which he should recognize as necessary for the protection of a third person." *Cantwell,* 506 Pa. at 41, 483 A.2d at 1353. As the Supreme Court emphasized in *DiMarco,* the physician's services to this end are "*not* taken to protect the health of the patient," but rather "*are taken to safeguard the health of others.*" *DiMarco,* 525 Pa. at 562, 583 A.2d at 424 (emphasis

in original). Under Section 324A, the third party has a cause of action in circumstances where "the physician should recognize that the services rendered to the patient are necessary for the protection of the third person." *Id.* at 562, 583 A.2d at 424–25.

In *Seebold,* the Supreme Court further described the nature of the duty outlined in Section 324A:

Section 324A provides, subject to several additional limitations, that one who "undertakes" to render services he should recognize as necessary for the protection of others is subject to liability for physical harm 'resulting from his failure to exercise reasonable care *to protect his undertaking.*' Restatement (Second) of Torts § 324A (emphasis added). Although awkwardly worded, the provision expressly circles back to the original undertaking, which, in the case of a physician, generally is the entry into the physician-patient relationship for treatment purposes. Thus, a physician entering into such a relationship which he should recognize as necessary for the protection of others has the duty to exercise reasonable care in the patient's treatment. Like *DiMarco,* Section 324A does not say that the service provider must assume additional duties, such as third-party interventions, above and beyond the initial undertaking. Rather, it merely prescribes for reasonable care to be taken vis-à-vis the original undertaking and establishes liability to certain third-parties where such care is lacking. Again, this is precisely the application of Section 324A reflected in the *DiMarco* duty to appropriately advise a patient for the benefit of a third person.

*Seebold,* 618 Pa. at 651–53, 57 A.3d at 1244–45 (emphasis in original).

▆ Appellees in this case allege that the failure to administer RhoGAM during

Mother's pregnancy with Sandeep in 1998 constituted a failure to provide reasonable care, which Drs. Muir and Pellegrino should have recognized was necessary for the protection of specifically identifiable third parties (Mother's future unborn children). Specifically, Appellees allege that because Mother's blood was Rh-negative, Father's blood was Rh-positive, and the fetus' (Sandeep's) blood was Rh-positive, the failure of Drs. Muir and Pellegrino to administer RhoGAM during Mother's pregnancy and within 72 hours of Sandeep's birth resulted in Mother becoming "sensitized" or "isommunized," a condition that increases the risks to the fetus in future pregnancies. Complaint, 6/26,2007, at ¶¶ 12–25. The administration of Rho-GAM serves no immediate benefit to the mother and does her no immediate harm, and is instead specifically designed and intended to prevent harm to a later-conceived child resulting from isoimmunization. Plaintiffs' Answer to Defendants' Motion for Summary Judgment, 11/3/2008, at Exhibit B (depositions of Drs. Muir and Pellegrino).

■ Importantly, as in *DiMarco* and *Troxel,* the alleged negligence in this case, namely the failure to administer RhoGAM, occurred during the course of Mother's treatment of her pregnancy with Sandeep in 1998 and within the confines of her physician-patient relationship with Drs. Muir and Pellegrino. As a result, *Seebold's* prohibition against requiring physicians to undertake interventions outside the physician-patient relationship has no application in this case. *Seebold,* 618 Pa. at 651–53, 57 A.3d at 1244–45. Instead, as the Supreme Court in *Seebold* made clear, while liability cannot be based upon a failure to undertake interventions outside the physician-patient relationship, Section 324A of the Second Restatement continues to require physicians to provide reasonable

care in the patient's treatment as is necessary for the protection of others, and establishes liability to certain third-parties when such reasonable care is lacking. *Id.* As such, Appellees' claim that the failure to administer RhoGAM during Mother's pregnancy with Sandeep in 1998 resulted in the death of Milan Matharu in 2005 states a claim under Section 324A, and the Supreme Court's decision in *Seebold* does not alter this conclusion.

For their second issue on remand, Appellants argue that a "newly created duty for a physician to a third party with whom the physician has no physician-patient relationship" circumvents the Medical Care Availability and Reduction of Error Act's ("MCARE") seven year statute of repose, 40 P.S. § 1303.513. Appellants contend that Appellees did not file suit until more than nine years after the alleged failure to administer RhoGAM, and thus the lawsuit is barred by the applicable statute of repose.

We disagree. We first note that Appellees' lawsuit is not based upon any "newly created duty," but rather a duty recognized under Section 324A of the Second Restatement. Moreover, while no physician-patient relationship existed between Drs. Muir and Pellegrino and Milan Matharu, Section 324A requires no such relationship between the physician and the injured third-party non-patient. *Seebold,* 618 Pa. at 651–53, 57 A.3d at 1244–45; *DiMarco,* 525 Pa. at 562–63, 583 A.2d at 424–25; *Troxel,* 675 A.2d at 318. A physician-patient relationship existed between Drs. Muir and Pellegrino and Mother, and the allegation that the failure to provide reasonable care within this relationship to protect certain readily identifiable third parties (including Milan Matharu) adequately states a claim under Section 324A.

In our prior (now vacated) *en banc* decision in this case, we concluded that the

statute of repose in subsection 1303.513(d) of MCARE controls in this circumstance, and that in this case the requirements of that provision had been satisfied since Appellees filed their lawsuit within two years of Milan Matharu's death. *Matharu,* 29 A.3d at 382. The Supreme Court's order remanding the case to this Court did so solely for the purpose of reconsideration in light of its decision in *Seebold.* The Supreme Court did not grant allowance of appeal of our ruling on the MCARE Act's statute of repose and it did not direct this Court to reconsider its ruling on that issue. As Appellants correctly note, however, this Court raised the applicability of the MCARE statute of repose for the first time on appeal, as an alternative ground for affirming the trial court's decision. *See, e.g., Barren v. Commonwealth,* 74 A.3d 250, 254 (Pa.Super.2013) (Superior Court may affirm on any basis supported by the record). Therefore, while reaffirming our prior *en banc* resolution of this issue, we will also address Appellants' arguments relating to the applicability of the MCARE Act statute of repose set forth in their brief on remand.

MCARE's statute of repose provides as follows:

### § 1303.513. Statute of repose

(a) General rule.—Except as provided in subsection (b) or (c), no cause of action asserting a medical professional liability claim may be commenced after seven years from the date of the alleged tort or breach of contract.

(b) Injuries caused by foreign object.— If the injury is or was caused by a foreign object unintentionally left in the individual's body, the limitation in subsection (a) shall not apply.

(c) Injuries of minors.—No cause of action asserting a medical professional liability claim may be commenced by or on behalf of a minor after seven years from the date of the alleged tort or breach of contract or after the minor attains the age of 20 years, whichever is later.

(d) Death or survival actions.—If the claim is brought under 42 Pa.C.S. § 8301 (relating to death action) or 8302 (relating to survival action), the action must be commenced within two years after the death in the absence of affirmative misrepresentation or fraudulent concealment of the cause of death.

(e) Applicability.—No cause of action barred prior to the effective date of this section shall be revived by reason of the enactment of this section.

(f) Definition.—For purposes of this section, a 'minor' is an individual who has not yet attained the age of 18 years.

40 P.S. § 1303.513.

On remand, Appellants argue that in our prior decision we mistakenly relied solely upon subsection 1303.513(d), and should also have applied the seven-year statute of repose in subsection 1303.513(a). Appellants' Brief on Remand at 42–43. According to Appellants, subsection (a) lists only subsections (b) and (c) as exceptions to the broad seven-year general limitation on all medical professional liability claims, and does not provide that subsection (d) constitutes an exception to the seven-year limitation. As such, Appellants contend that the proper interpretation of section 1303.513 as a whole for wrongful death and survival actions is to require compliance with both subsections (a) and (d)—such that wrongful death and survivor lawsuits must be brought within two years of the death of the person ***and*** within seven years from the date of the original tort. *Id.* at 43. Here, Appellants posit that while Appellees filed the present lawsuit within two years of Milan Matharu's death, they did not file it within seven years of the original tort (the failure to administer RhoGAM in October 1998). For this reason, Appellants

insist that Appellees' lawsuit is time-barred.

 Statutory interpretation presents a question of law subject to plenary review. *See, e.g., Mohamed v. Com., Dept. of Transp., Bureau of Motor Vehicles,* 615 Pa. 6, 18, 40 A.3d 1186, 1193 (2012). The goal and purpose of statutory interpretation is to ascertain legislative intent and give it effect. 1 Pa.C.S.A. § 1921(a). In discerning that intent, our inquiry begins with the language of the statute itself. If the language of the statute unambiguously sets forth the legislative intent, this Court will apply that intent to the case at bar and not look beyond the statutory language to ascertain its meaning. 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). We will resort to the rules of statutory construction only when there is an ambiguity in the statutory language at issue. *Oliver v. City of Pittsburgh,* 608 Pa. 386, 394, 11 A.3d 960, 965 (2011).

Reviewing the language of section 1303.513, including in particular its subsections (a) and (d), we conclude that there is a clear ambiguity, as it may be interpreted in at least two ways. First, it may be read as Appellants suggest, such that wrongful death and survival actions must be commenced within seven years of the date of the alleged act of medical negligence (pursuant to subsection (a)) *and* within two years of the death at issue (pursuant to subsection (d)). As Appellants point out, subsection (a) sets forth a general rule that purports to apply to all medical professional liability claims and does not identify subsection (d) as an exception to the general rule.

 Alternatively, rather than construing subsection 1303.513(d) as an *additional* requirement for wrongful death and survival actions, it may also be read to set forth merely a *different* limitations period for filing death claims. Nowhere in subsection (d) does the legislature indicate that the seven-year requirement in subsection (a) also applies. Subsection (a) likewise makes no reference to subsection (d). Moreover, the nature of the limitations period in subsection (d) is fundamentally different from the general rule in subsection (a), since subsection (d)'s two-year period may be extended if there exists a fraudulent misrepresentation or fraudulent concealment of the cause of death. As this Court has ruled, fraudulent misrepresentations or fraudulent concealments do not extend the seven-year period in subsection (a). *Osborne v. Lewis,* 59 A.3d 1109, 1117 (Pa.Super.2012), *appeal denied,* ── Pa. ──, 70 A.3d 812 (2013). Thus under Appellants' preferred interpretation, fraudulent misrepresentation or concealment would extend the two-year period in subsection (d), but only up to a maximum of seven years (per subsection (a)). Nothing in the language of either subsection, however, suggests that the legislature ever intended such a result.

 Having concluded that an ambiguity exists, we must apply rules of statutory interpretation. Of relevance here, "[b]ecause the legislature is presumed to have intended to avoid mere surplusage, every word, sentence, and provision of a statute must be given effect." *Allegheny County Sportsmen's League v. Rendell,* 580 Pa. 149, 163, 860 A.2d 10, 19 (2004). Statutes are considered to be *in pari materia* when they relate to the same persons or things, and statutes or parts of statutes *in pari materia* shall be construed together, if possible. 1 Pa.C.S.A. § 1932; *Allstate Life Ins. Co. v. Com.,* 617 Pa. 1, 52 A.3d 1077, 1080 (2012). We may also assume the legislature does not intend a result that is absurd, unreasonable, or impossible

of execution. 1 Pa.C.S.A. § 1922; *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC,* 40 A.3d 145, 151 (Pa.Super.2012).

■ Applying these rules, we cannot agree with the interpretation of section 1303.513 proposed by Appellants, as Appellants' interpretation violates our obligation to avoid mere surplusage and to give effect to every word, sentence, and provision of a statute. In this regard, we must first distinguish between statutes of repose and statutes of limitation. In *Vargo v. Koppers Co., Inc.,* 552 Pa. 371, 715 A.2d 423 (1998), our Supreme Court held that the distinguishing feature between the two is that "statutes of repose potentially bar a plaintiff's suit before the cause of action arises, whereas statutes of limitation limit the time in which a plaintiff may bring suit after the cause of action arises." *Id.* at 375, 715 A.2d at 425. As such, statutes of repose begin to run at the time of the negligent act, while statutes of limitation do not begin to run until the cause of action accrues.

Based upon this distinction, as the title to section 1303.513 portends, subsection 1303.513(a) sets forth a statute of repose for medical professional liability claims. It sets forth a maximum allowable period of time (seven years) to file such claims, and this time period commences on the date of the act of alleged negligence or the breach of contract. Although the phrase "tort or breach of contract" is not defined in MCARE, the phrase "medical professional liability claim" is defined as a claim "arising out of any tort or breach of contract *causing injury or death* resulting from the furnishing of health care services ..." 40 P.S. § 1303.103 (emphasis added). This definition's clear distinction between the "tort or breach of contract" and the resulting injury establishes that the "tort or breach of contract" refers to the *act* underlying the liability claim, rather than the accrual of the cause of action itself. Subsections 1303.513(b) (foreign objects) and (c) (minors) constitute exceptions to subsection (a)'s statute of repose.

■ In significant contrast, subsection 1303.513(d) does not set forth a statute of repose at all, but rather is a statute of limitation. Pursuant to subsection (d), wrongful death claims under 42 Pa.C.S.A. § 8301 and survival claims under 42 Pa. C.S.A. § 8302 must be commenced within two years after the death, unless there is fraudulent misrepresentation or concealment as to the cause of death. This provision is a statute of limitation because the period within which the claim must be filed begins to run not at the time of the act of alleged negligence, but rather at the time of the accrual of the cause of action. In other words, the two-year time period under subsection (d) does not begin to run until the injury (death) occurs, unless there is fraud relating to the cause of death, in which case the two-year period is tolled until the plaintiff knows or reasonably should have known of the cause of death. *Krapf v. St. Luke's Hospital,* 4 A.3d 642, 649 (Pa.Super.2010), *appeal denied,* 613 Pa. 670, 34 A.3d 832 (2011).

Moreover, and importantly for present purposes, the statute of limitations set forth in subsection 1303.513(d) is the exact same statute of limitation that was already applicable to wrongful death and survivor claims at the time the Pennsylvania Legislature passed MCARE (including its section 1303.513) in 2002. Pursuant to 42 Pa.C.S.A. §§ 5524 and 5502(a), death claims must be commenced within two years of the date of accrual, and 42 Pa. C.S.A. § 5504(b) provides for the extension of the two-year limitations period in the event of fraud. 42 Pa.C.S.A. §§ 5524, 5502(a), 5504(b). And while a fraudulent misrepresentation or concealment will toll

the two-year statute of limitations, the discovery rule (applicable to other negligence actions) has no application in death claims since death is a "definitely established event" and puts survivors on immediate notice to determine if any negligence occurred. *See, e.g., Pastierik v. Duquesne Light Co.,* 514 Pa. 517, 522, 526 A.2d 323, 326 (1987); *Anthony v. Koppers Co.,* 496 Pa. 119, 124, 436 A.2d 181, 184 (1981). Similarly, subsection 1303.513(d) does not provide that the discovery rule may toll its two-year time limitation.

With these points established, it becomes clear that Appellants' preferred interpretation of section 1303.513 results in subsection (d) being mere surplusage. As explained above, Appellants contend that wrongful death and survival actions must be commenced within seven years of the date of the alleged act of medical negligence and within two years of the death at issue. If the legislature had so intended, subsection (d) would not have been included in section 1303.513, and wrongful death and survival actions would have been controlled by the seven year statute of repose set forth in 1305.513(a). Thus, wrongful death and survival actions would have to be commenced within seven years of the date of the alleged act of medical negligence (per subsection 1303.513(a)) and within two years of the death at issue, absent fraud relating to the cause of death (per 42 Pa.C.S.A. §§ 5524, 5502(a), and 5504(b)). As such, under Appellants' preferred interpretation of section 1303.513, subsection (d) is mere irrelevant verbiage. Such an interpretation does not comport with the rules of statutory interpretation. 1 Pa.C.S. § 1921(c); *Walker v. Eleby,* 577

Pa. 104, 123, 842 A.2d 389, 400 (2004) (no provision should be "reduced to mere surplusage").

Instead, to give effect to all of the provisions of section 1303.513, including its subsection (d), it must be interpreted to provide that wrongful death and survival actions are not subject to the general statute of repose in subsection 1303.513(a). No other interpretation offers a cogent explanation in our attempt to discern the legislature's intention in enacting subsection 1303.513(d), as no other interpretation explicates why the legislature would restate the then-existing statute of limitation for death actions immediately after setting forth a new statute of repose for medical liability claims generally. As such, we conclude that the general statute of repose in subsection 1303.513(a) does not apply to wrongful death and survival actions, and Appellees' claims are thus not time-barred in this case.

Appellants complain that this interpretation unfairly subjects them to potential liability for many years after the date of the negligence in 1998. Having interpreted the legislative intent in enacting section 1303.513, we leave the consideration of further time restrictions to the Pennsylvania Legislature. We note, however, that while one of the purposes in enacting MCARE was to provide additional time limitations on malpractice suits in order to ensure that medical professional liability insurance is "obtainable at an affordable and reasonable cost," 40 P.S. § 1303.102(3),[2] the provisions of section 1303.513 as a whole do not reflect any legislative intent to strictly limit the filing of all malpractice

**2.** As Chief Justice Castille explained in his dissenting opinion in *Wexler v. Hecht,* 593 Pa. 118, 928 A.2d 973 (2007), "[t]he MCARE Act was a response to a widely publicized perceived health care crisis in Pennsylvania, which included an alleged fear on the part of

medical practitioners that malpractice insurance was becoming unaffordable resulting in some medical doctors opting to leave practice in the Commonwealth." *Id.* at 140, 928 A.2d at 986 (Castille, C.J., dissenting).

claims to seven years from the date of the negligence. Subsection 1303.513(b), for instance, provides that subsection (a)'s seven-year statute of repose has no application in cases where the injury was caused by a foreign object left in the individual's body. 40 P.S. § 1303.513(b). Subsection 1303.513(c) permits a suit filed by or on behalf of a minor to be commenced within seven years of the date of the tort or until the minor reaches the age of 20, whichever comes later. 40 P.S. § 1303.513(c). Both of these subsections permit the filing of medical malpractice claims well beyond seven years after the date of the alleged negligence. As such, we perceive no conflict between our interpretation of section 1303.513 and any intent on the part of the legislature, as a matter of public policy or otherwise, to strictly limit liability in all instances to a seven-year period, as Appellants suggest should obtain in the circumstances presented here.

Order affirmed.