J-S05018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| SHELLY AUMAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| FAMILY PLANNING PLUS, | |
| Appellee | No. 582 MDA 2015 |

Appeal from the Order Entered March 3, 2015
In the Court of Common Pleas of Union County
Civil Division at No(s): 13-0144

BEFORE:  BENDER, P.J.E., SHOGAN, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED FEBRUARY 22, 2016**

Appellant, Shelly Auman, appeals from the order granting Appellee, Family Planning Plus ("FPP"), a nonprofit corporation providing reproductive health services, summary judgment on March 3, 2015.  We affirm.

Appellant filed a complaint on March 15, 2013, raising a claim under the Pennsylvania Whistleblower Law[1] ("the Law"), in count one and alleging wrongful discharge in count two.  Complaint, 3/15/13, at 6–7.  Appellant worked at FPP from December 2007 until January 29, 2013.  *Id*. at 3, ¶ 11. In support of her claim under the Law in her complaint, Appellant asserted

_____

[*]  Retired Senior Judge assigned to the Superior Court.

[1] Act of December 12, 1986, P.L. 1559, as amended, 43 P.S. §§ 1421–1428.

that prior to her discharge, she "made a good faith report of waste and/or fraud committed by [FPP] and was discharged in reprisal for that report." *Id*. at 6, ¶ 45.

The Whistleblower Law provides a civil cause of action to employees for violations of its provisions. "It is chiefly a remedial measure" whose purpose is to compel compliance with the law "by protecting those who inform authorities of wrongdoing." ***Bensinger v. University of Pittsburgh Medical Center***, 98 A.3d 672, 677 (Pa. Super. 2014). The trial court summarized Appellant's Whistleblower claim as follows:

> The Whistleblower claim arises from allegations of separate instances of improper practices and events at Family Planning Plus "FPP": 1) Listing Dr. Levine as the medical director in billing software when he was no longer licensed to practice medicine in Pennsylvania; 2) Improperly billing Medical Assistance and the Select Plan Program for office visits when patients/clients were actually coming into the center to pick up prescriptions; 3) Improperly billing for "free" samples of a contraceptive device ("NuvaRing"); 4) Improperly billing a private insurance carrier for a "free" sexually transmitted disease screening program; and 5) Placing a charge on another patient's account to cover the crediting of the account of another patient who had overpaid for services.

Trial Court Opinion, 3/3/15, at 4.

Following the filing of the complaint, FPP filed an answer and new matter on May 30, 2013, and Appellant filed her reply to new matter on June 7, 2013. After the close of pleadings and discovery, FPP filed a motion for summary judgment on December 31, 2014, asserting that Appellant had not produced reports of wrongdoing and could not establish a causal connection

between any such reports and her termination. Motion for Summary Judgment, 12/31/14, at 8, ¶ 57. Appellant filed an answer to the motion on February 5, 2015. The trial court granted FPP's motion for summary judgment on March 3, 2015, and dismissed the case. Appellant filed a timely appeal to this Court on March 31, 2015. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issue on appeal:

1. Did the lower [c]ourt err in granting [FPP's] motion for summary judgment on [Appellant's] Wrongful Discharge and Whistleblower Act claims?

Appellant's Brief at 5.[2]

We exercise plenary review in an appeal from an order granting summary judgment. *Matharu v. Muir*, 86 A.3d 250, 255 (Pa. Super. 2014) (*en banc*). Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to relief as a matter of law. *Id*. (citing Pa.R.C.P. 1035.2). An appellate court may reverse a grant of summary judgment only if there has been an error of law or an abuse of discretion. *Kennedy v. Robert Morris Univ.*, ___ A.3d ___, 2016

_____

[2] "The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail." Pa.R.A.P. 2116(a). While the statement of the issue lacked **necessary** detail and should have been divided into two questions, the argument section of Appellant's brief is compliant with our appellate rules. Because our appellate review is not hampered, we shall address Appellant's issue as two separate questions involving the two separate counts of the complaint, beginning with the Whistleblower count.

PA Super 16 (Pa. Super. filed January 29, 2016). "[W]e will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Matharu*, 86 A.3d at 255.

When a motion for summary judgment is premised on the contention that the party bearing the burden of proof at trial cannot produce sufficient facts to establish an aspect of her case necessary to carry her burden, as here, the non-moving party must produce evidence sufficient to establish or contest a material aspect of the case. *Rohrer v. Pope*, 918 A.2d 122, 127–128 (Pa. Super. 2007). Failure to do so entitles the moving party to judgment as a matter of law. *Id*.

The Whistleblower Law affords a remedy for victims of retaliatory actions by employers. 43 P.S. § 1423, Protection of employees.[3] In pertinent part, the Law provides as follows:

_____

[3] The Law, however, only protects "employees" who render services for a "public body." 43 P.S. § 1422. The term "public body" is defined, in relevant part, as "[a]ny other body which is created by Commonwealth or political subdivision authority or **which is funded in any amount** by or through Commonwealth or political subdivision authority or a member or employee of that body." *Id*. (emphasis added). We note that while the complaint asserted that FPP is a public body within the meaning of the statute because it receives public funding through the Commonwealth of Pennsylvania or a political subdivision thereof, Complaint, 3/15/13, at 6, ¶ 44, as evidenced by statements on FPP's website, *id*. at ¶ 10, the substantiating documentation, Exhibit A, is not attached to the complaint as is represented therein. *Id*. Because there is no issue raised concerning the Law's applicability, we merely note this insufficiency of the certified record.
*(Footnote Continued Next Page)*

**(a) Persons not to be discharged.**--No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a). Appellant maintains that she has an action against FPP pursuant to 43 P.S. § 1424, Remedies, which provides as follows:

**(a) Civil action.**--A person who alleges a violation of this act may bring a civil action in a court of competent jurisdiction for appropriate injunctive relief or damages, or both, within 180 days after the occurrence of the alleged violation.

43 P.S. § 1424(a).

"To prove a cause of action for wrongful discharge under the Whistleblower Law, the plaintiff must show both a protected report of wrongdoing or waste and a causal connection between that report and the discharge." *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1064 (Pa. Cmwlth. 2013) (citing *O'Rourke II v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001)).

> The causal connection that the Whistleblower Law requires must be demonstrated "by concrete facts or surrounding circumstances that the report of wrongdoing or waste led to the plaintiff's dismissal, such as that there was specific direction or

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

We note, as well, that we have rejected an attempt to extend the Whistleblower Law to cover private employees. *Krajsa v. Keypunch, Inc.*, 622 A.2d 355, 360 (Pa. Super. 1993) ("We are not prepared to expand the coverage of the [Whistleblower Law] into the private arena.").

information received not to file the report or that there would be adverse consequences because the report was filed." [***Golaschevsky v. Department of Environmental Protection***, 720 A.2d 757, 759 (1998)] (quoting [***Gray v. Hafer***, 651 A.2d 221, 225 (Pa. Cmwlth. 1994]); ***see also Sea v. Seif***, 831 A.2d 1288, 1293 n.5 (Pa. Cmwlth. 2003). . . . The burden shifts to the defendant to show a separate and legitimate reason for its actions only where plaintiff has satisfied the threshold showing of a causal connection. ***O'Rourke***, 566 Pa. at 171–72, 778 A.2d at 1200. "Vague and inconclusive circumstantial evidence" is insufficient to satisfy that threshold burden to show a causal connection and shift the burden to the defendant to justify its actions. ***Golaschevsky***, 554 Pa. at 163, 720 A.2d at 759; ***Sea***, 831 A.2d at 1293 n.5.

***Evans***, 81 A.3d at 1070. Here, the evidence is insufficient to prove the essential elements of a Whistleblower Law cause of action.

The trial court summarized Appellant's observations and basis for her Whistleblower claim as follows:

Dr. Mickey Levine had served as the medical director for FPP. Dr. Levine had planned to retire effective December 31, 2012 and would no longer maintain an active medical license. Dr. Glenn Sherman assumed the duties of medical director effective November 1, 2012. See, Exhibit "B" attached to [FPP's] Motion for Summary Judgment. While performing her clerical duties in January 2013, [Appellant] observed that Dr. Levine's name appeared as medical director of the center on billing software notwithstanding the fact that he was no longer serving in this capacity and supposedly no longer held an active license to practice medicine. Upon seeing Dr. Levine's name, [Appellant] asked a co-worker "is this legal?" See, Deposition of Shelly Auman, [Appellant's] Response to Summary Judgment Motion, Appendix, Exhibit "A" page 16.

* * *

[Appellant's] second allegation of improprieties at FPP which forms the basis of her Whistleblower claim stems from supposed improper billings of Medical Assistance and Select Plan for office visits.

- 6 -

* * *

[Appellant's] third allegation of wrongdoing which forms the basis of her Whistleblower claim concerns billing Medical Assistance and Select Plan for free samples of NuvaRing—a contraceptive device.

* * *

[Appellant's] fourth allegation of wrongdoing and improper practices at FPP involve billing private insurance carriers—Blue Cross and Blue Shield—for a "free" STD program.

* * *

The final allegation of wrongdoing at FPP averred in support of [Appellant's] Whistleblower claim involves an overcharge to a patient at the Selinsgrove clinic.[2] From what we glean from the depositions submitted, a patient was overcharged for services. This overcharge was discovered and [as] a result FPP refunded the overcharge to the patient per the patient's instruction by crediting her credit card. The allegation is that FPP's Executive Director, Peggy Moser, instructed the staff to put the same charge on some other account—the inference being that by overcharging another patient, FPP would recover the dollar amount it had credited to the initial patient who had been overcharged originally.

> [2] [Appellant] has averred that the overcharge involved amounted to $69.00. The FPP employees deposed testified consistently that the correct dollar amount involved is $65.00.

Trial Court Opinion, 3/3/15, at 4–11.

Appellant maintains that she made out a *prima facie* case for retaliatory discharge under the Law. Appellant's Brief at 13. She argues that prior to her discharge, she made a good-faith report of wrongdoing and "was discharged in reprisal for that report." Complaint, 3/15/13, at 6, ¶ 45.

- 7 -

The evidence in support of her claim was that she discussed all of her concerns about her observations at FPP with a co-worker, Jean Flournoy, but no one else at FPP. Appellant's Deposition, 8/13/14, at 15, 18, 20, 22, 24. Moreover, Appellant testified that she had no knowledge that Ms. Flournoy discussed any of these issues with anyone else at FPP. *Id*. at 19, 20. While Appellant contends that Ms. Flournoy "was, for all intents and purposes, a 'supervisor' despite [FPP's] pleas to the contrary," Appellant's Brief at 13, this assertion is belied by the record. Appellant herself acknowledged and admitted that Ms. Flournoy did not have "supervisory duties over [her]." Appellant's Deposition, 8/13/14, at 16. At her deposition, Ms. Flournoy testified that she did not recall Appellant mention any of the alleged acts of wrongdoing and did not recall telling anyone else about those issues. Flournoy Deposition, 9/22/14, at 26–27. Appellant also admitted that she never made any written inquiry or complaint regarding the alleged issues of wrongdoing. Appellant's Deposition, 8/13/14, at 20, 22.

Our review of the record convinces us that the trial court correctly determined that Appellant could not prove the essential elements of her Whistleblower Law claim. There is no evidence that Appellant reported wrongdoings by FPP, either verbally or in writing. There is clear evidence, however, that FPP terminated Appellant for issues regarding slamming doors, taking excessive smoking breaks, using her mobile telephone during work hours, displaying a negative attitude, and failing to accept constructive

criticism. Motion for Summary Judgment, 12/31/14, at 6 ¶ 42; Exhibit G. Moreover, FPP disciplined Appellant on three prior occasions for refusing to follow directions and displaying an inability to work with co-workers. *Id*. at 6 ¶ 43; Exhibits H, I, and J. We rely on the trial court's explanation in its opinion granting summary judgment, as explained *infra*.

Appellant also urges us to find that the public policy exception to the general principles of at-will employment applies to her. Complaint, 3/15/13, at 7, ¶ 49; Appellant's Brief at 18. Pennsylvania does not recognize a common law action for wrongful termination of at-will employment. ***Weaver v. Harpster***, 975 A.2d 555, 562 (Pa. 2009). As an at-will employee, Appellant "may be terminated at any time, for any reason or for no reason." ***Stumpp v. Stroudsburg Mun. Auth.***, 658 A.2d 333, 335 (Pa. 1995). An employee may bring a cause of action for a termination of that relationship only in the most limited circumstances, "where the termination violates a clear mandate of public policy." ***Roman v. McGuire Memorial***, 127 A.3d 26, 32 (Pa. Super. 2015) (quoting ***McLaughlin v. Gastrointestinal Specialists, Inc.***, 750 A.2d 283, 287 (Pa. 2000)). Appellant claims she was wrongfully discharged in retaliation for reporting alleged fraud in billing practices by FPP; thus, she argues that the public policy exception to the employment at-will doctrine applies. Complaint, 3/15/13, at 7, ¶ 49; Appellant's Brief at 18–19.

The trial court determined:

>    We will also grant [FPP] the same relief and grant summary judgment in favor of [FPP] as to Count II, as well, sounding in Wrongful Discharge. Count II of the Complaint incorporates by reference the allegations averred in Count I. Count II does not aver any factual allegations exclusive of the allegations pleaded in the "Whistleblower" count of the Complaint. Paragraphs 50 and 51 of the Complaint simply recite language from case authority stating the exceptions to the "at will" employment doctrine. Clearly, Count II of the Complaint is based solely on the allegations averred in Count I. Since we have concluded that [Appellant] has not met her evidentiary burden to survive summary judgment as to Count I, it follows that we must reach the same conclusion regarding Count II of the Complaint. Therefore, we will grant summary judgment as to Count II as well.

Trial Court Opinion, 3/3/15, at 19. We agree that Appellant cannot avail herself of the public policy exception.

Because the trial court correctly concluded that Appellant could not prove the essential elements of her Whistleblower Law claim or cause of action for wrongful discharge, we affirm the order granting summary judgment, and we do so in reliance on the thorough opinion of the Honorable Michael H. Sholley, filed March 3, 2015.[4]

---

[4] The parties are directed to attach a copy of the trial court's opinion of March 3, 2015, to any future filings in this matter.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/22/2016

FILED
UNION COUNTY, PA

2015 MAR -3 PM 2: 06

PROTHONOTARY
CLERK OF COURTS

| | |
|---|---|
| SHELLY AUMAN, <br>     Plaintiff | IN THE COURT OF COMMON PLEAS <br> OF THE 17TH JUDICIAL DISTRICT <br> OF PENNSYLVANIA <br> UNION COUNTY BRANCH |
| V. | CIVIL ACTION – LAW |
| FAMILY PLANNING PLUS, <br>     Defendant | NO 13 – 0144 |

## OPINION

**SHOLLEY, J. - March 3, 2015**

Plaintiff has commenced this action in which she pleads a violation of Pennsylvania's Whistleblower Law [43 P.S. § 1421, *et seq.*] and a cause of action sounding in Wrongful Discharge.[1] Plaintiff avers that she was terminated because she "tried to report illegal activity conducted by Defendant and its agents." [See, Complaint, Paragraph 41]. Regarding her "Wrongful Discharge" claim, Plaintiff avers her discharge "...constitutes a public policy violation" and that she was discharged "...for participating in conduct required by law, refusing to perform acts prohibited by law and engaging in conduct she was permitted to engage in under the law.." [See, Complaint, Paragraphs 49, 51].

---

[1] We note at the onset of our discussion herein that Plaintiff demands a jury trial. Our Superior Court has held that "...there is no right to a jury trial under the Pennsylvania Constitution for a claim brought pursuant to our Commonwealth's Whistleblower Law." *Bensinger v. University of Pittsburgh Medical Center*, 98 A.3d 672, 682 (Pa.Super.2014).

1

Defendant has filed a Motion for Summary Judgment requesting that we dismiss both Counts in the Complaint averring, *inter alia*, "...Plaintiff has failed to produce evidence of facts essential to her causes of action..." After reviewing the evidentiary record submitted by both sides, we must agree. We will grant Defendant's summary judgment motion and will dismiss the Complaint with prejudice.

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law...if, after the completion of discovery relevant to the motion,...an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action...which in a jury trial would require the issues to be submitted to a jury." 42 Pa.R.C.P. No.1035.2(2). "When a motion for summary judgment is based on insufficient evidence to support the factual basis for the cause of action..., the non-moving party must come forward with *sufficient* evidence essential to the cause of action. The evidence adduced by the non-moving party must be of such a quality that a jury could return a favorable verdict to the non-moving party on the issue or issues challenged by a summary judgment request." *InfoSAGE, Inc. v. Mellon Ventures, L.P.,* 896 A.2d 616, 625 (Pa.Super.2006) (citations omitted) (emphasis in original).

"Allowing non-moving parties to avoid summary judgment where they have no evidence to support an issue on which they bear the burden of proof runs contrary to the spirit of Pennsylvania Rules of Civil Procedure 1035.1-.5...[T]he mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial...Forcing parties to go to trial on a

2

meritless claim under the guise of effectuating the summary judgment rule is a perversion of that rule...[A] non-moving party must adduce sufficient evidence on an issue essential to [her] case and on which [she] bears the burden of proof such that a [factfinder] could return a verdict in [her] favor." *Ertel v. Patriot-News Co.*, 674 A.2d 1038, 1042 (Pa.1996).

Certainly, we recognize that in granting summary judgment in favor of Defendant and against Plaintiff, we must conclude that the record lacks sufficient factual evidence to make out a *prima facie* cause of action such that there is no issue to be submitted to a factfinder. *Lackner v. Glosser*, 892 A.2d 21 (Pa.Super.2006). "Summary judgment should be entered only in those cases in which it is clear and free from doubt that the moving party is entitled to judgment as a matter of law." *Bullman v. Giuntoli*, 761 A.2d 566, 569 (Pa.Super.2000). "When there is evidence that would allow a jury to find in the non-moving party's favor, summary judgment should be denied and the case should proceed to trial." *Porter v. Joy Realty, Inc.*, 872 A.2d 846, 848—49 (Pa.Super.2005).

We note that a substantial portion of the record submitted by the parties consists of deposition testimony. "The general rule flowing from *Nanty-Glo v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (Pa. 1932) is that summary judgment may not be had where the moving party relies exclusively upon oral testimony, either through testimonial affidavits or deposition testimony, to establish the absence of a genuine issue of material fact. Where the moving party supports its motion for summary judgment by using the admissions of the opposing party, however, even though they are testimonial, *Nanty-Glo* does not forbid the entry of summary judgment. In such a situation, the court may grant the motion without determining the credibility of testimony, for it is an

3

'unconditional surrender' by the opposing party, to which [she] must be held." *Bowe v. Allied Signal, Inc.,* 806 A.2d 435, 440 (Pa.Super.2002).

With this legal authority in mind, we turn to Plaintiff's allegations and the evidentiary record before the Court.

### Violation of Whistleblower Law

Plaintiff alleges that "[p]rior to her discharge, Plaintiff made a good faith report of waste and/or fraud committed by Defendant and was discharged in reprisal for that report." [Complaint, Paragraph 45]. The Whistleblower claim arises from allegations of separate instances of improper practices and events at Family Planning Plus ["FPP"]: 1) Listing Dr. Levine as the medical director in billing software when he was no longer licensed to practice medicine in Pennsylvania; 2) Improperly billing Medical Assistance and the Select Plan Program for office visits when patients/clients were actually coming into the center to pick up prescriptions; 3) Improperly billing for "free" samples of a contraceptive device ("NuvaRing"); 4) Improperly billing a private insurance carrier for a "free" sexually transmitted disease screening program; and 5) Placing a charge on another patient's account to cover the crediting of the account of another patient who had overpaid for services.

We summarize the "Dr. Levine incident" as follows. Dr. Mickey Levine had served as the medical director for FPP. Dr. Levine had planned to retire effective December 31, 2012 and would no longer maintain an active medical license. Dr. Glenn Sherman assumed the duties of medical director effective November 1, 2012. [See, Exhibit "B" attached to Defendant's Motion for Summary Judgment]. While performing her clerical duties in January 2013, Plaintiff observed that Dr. Levine's name appeared

4

as medical director of the center on billing software notwithstanding the fact that he was no longer serving in this capacity and supposedly no longer held an active license to practice medicine. Upon seeing Dr. Levine's name, Plaintiff asked a co-worker "is this legal?" [See, Deposition of Shelly Auman, Plaintiff's Response to Summary Judgment Motion, Appendix, Exhibit "A" page 16]. We reproduce below pertinent excerpts from Ms. Auman's deposition in which she is questioned by defense counsel.

Q: Now I would like to get into the allegations of your complaint...you generally complain that Dr. Levine—am I pronouncing that correct?

A: Doctor Levine, yes.

Q: That Dr. Levine was still listed as medical director on billing software.

A: Yes.

Q: Do you recall those allegations?

A: Yes.

Q: Can you can [sic] explain the situation and why that was a problem for you?

A: I was—I worked front desk. I was doing the billing, and in January Dr. Levine's name was still coming up in the software and I questioned how we could do that because his license had expired in December.

Q: Now, was Dr. Levine seeing any patients at that time?

A: I don't know. Not at our office. He was medical director.

Q: So I'm trying to pin down what our complaint was. Was your complaint that Dr. Levine was seeing patients while he didn't have a license or that Dr. Levine's name happened to be in the software as of January 1, 2013?

A: In the software.....

5

Q: So from your perspective what is the problem with having Dr. Levine's name being included in the billing software?

A: His license wasn't valid. How could we bill with his name on there? That's what I was asking.

Q: Were you aware as of January 1, 2013 that Dr. Sherman was going to be coming on as the new medical director?

A: Yes, I was aware....

Q: And were you aware at the time, meaning January 1st 2013, that Dr. Sherman had a medical license?

A: I believe so.

Q: Now, you indicated in your complaint that you brought this issue to someone's attention at Family Planning Plus.

A: Yes.

Q: Do you recall who that was?

A: I know for sure I had discussed this with Jean Flournoy.

Q: And who is Jean Flournoy?

A: She was a coworker.

Q: Do you recall what her position is or was?

A: I believe it was clinician's assistant.

Q: Was she above you in the hierarchy of employees at Family Planning Plus or was she on the same level?

A: She had more seniority. She had been there since, I don't know, the beginning. She was there for a very long time.

Q: **Did she have any supervisory duties over you?**

A: **No.**

Q: **Did you bring the issue of Dr. Levine's license to anybody else's attention at Family Planning Plus?**

6

A:  **No....**

Q:  Do you recall when you brought this issue to Ms. Flournoy's attention?

A:  **....I know in January when I sat down at the front desk and started up the billing and Dr. Levine's name was still on there I said, is this legal? That's all I did was ask questions.**

Q:  And who did you ask those questions of?

A:  Jean. She trained me.

Q:  Did you make any written inquiry as to Dr. Levine's license?

A:  No, sir....

Q:  Do you have any specific knowledge that [Jean Flournoy] spoke to anybody about this particular issue?

A:  No sir, I do not.

Q:  And you didn't speak to anybody else about this issue?

A:  Not that I can recall.

[Auman Deposition, pp. 12 –17] (emphasis supplied).

Plaintiff's second allegation of improprieties at FPP which forms the basis of her Whistleblower claim stems from supposed improper billings of Medical Assistance and Select Plan for office visits. Again we have reproduced Ms. Auman's deposition testimony relevant to this allegation.

Q:  Can you tell me or explain that situation to me?

A:  **I don't recall the specifics, but I do know I did question certain billing practices.**

Q:  Was it with respect to office visits?

A:  It was.

Q:  And what was the problem from your perspective.

7

A:     I asked why certain ones were billed for office visits when others were not.

Q:     And to whom did you pose that question?

A:     Jean Flournoy.

Q:     Did you pose that question to anyone else other than Jean?

A:     I do not recall.

Q:     Did anything come of your discussions with Jean regarding that issue?

A:     I feel I was fired because of the questions.

Q:     And do you have any specific reason to believe that Jean Flournoy spoke to anybody about this specific issue?

A:     Yes. Like I said, she spoke to everyone about everything.

Q:     Do you have any specific knowledge of Jean speaking to anybody about this particular issue?

A:     No sir, I do not.

Q:     ...Did you pose any written questions regarding this issue or any written complaint or any other inquiry about this specific issue?

A:     No, sir.

[Auman Deposition, pp. 18—19] (emphasis added).

Plaintiff's third allegation of wrongdoing which forms the basis of her Whistleblower claim concerns billing Medical Assistance and Select Plan for free samples of NuvaRing—a contraceptive device. Again we produce Plaintiff's deposition testimony regarding this concern.

Q:     Okay, let me move on to the issue you raise in the complaint regarding billing medical assistance and Select Plan for NuvaRing samples. Could you explain what you mean by that?

8

A:    We were told to bill medical assistance for samples of NuvaRing and they would be replaced with ones they bought and I questioned it because it says samples are not be resold.

Q:    And who did you question about that?

A:    Jean Flournoy.

Q:    Did you question anybody else about that?

A:    I do not recall if I did.

Q:    Do you have any specific knowledge of Jean Flournoy mentioning that issue to anyone else?

A:    No sir, I do not.

Q:    To your knowledge were any NuvaRing samples that were sold replaced with NuvaRings that were purchased?

A:    Not to my knowledge.

Q:    Could that have happened without you knowing it?

A:    Yes.

Q:    And did you make any written inquiry or complaint regarding that issue?

A:    No, sir, I did not.

[Auman Deposition, pp. 19—20].

Plaintiff's fourth allegation of wrongdoing and improper practices at FPP involve billing private insurance carriers—Blue Cross and Blue Shield—for a "free" STD program. Again, we look to Plaintiff's deposition testimony as her <u>evidence</u> in support of the Whistleblower claim.

Q:    Miss Auman, in paragraphs 27 and 28 of your complaint you allege that you were instructed with respect to patients who have Blue Cross and Blue Shield to check with them to see if it was okay to bill insurance for a free STD program. Do you recall those allegations?

A:    Yes.

9

Q: Can you explain that to me?

A: I just questioned whether it was right to bill for a program that was free.

Q: Now, do you know how the STD program worked?

A: Yes, sir.

Q: And how did it work with respect to billing?

A: Oh, my goodness. It was free services, free STD testing, free STD treatment. Things were changing. There was new billing. There was—it was discussed in the meeting and I just asked if we advertise a free program, you know, it's free, isn't it?

Q: Now, did you understand that program to be free for anybody that wanted it?

A: Yes.

Q: And do you know in fact if that's the case?

A: I am unsure.

Q: And to whom did you pose any questions or concerns about that issue?

A: Jean Flournoy.

Q: Did you speak with anybody else about it?

A: No, sir.

Q: Did you make any written inquiries or complaints regarding that issue?

A: No, sir.

Q: Do you have specific knowledge that Jean Flournoy spoke to anyone else about that issue?

A: No, sir.

Q: And do you recall when you raised that issue with Jean?

A: No, sir, I do not.

10

[Auman deposition, pp. 21—23].

The final allegation of wrongdoing at FPP averred in support of Plaintiff's Whistleblower claim involves an overcharge to a patient at the Selinsgrove clinic.[2] From what we glean from the depositions submitted, a patient was overcharged for services. This overcharge was discovered and a result FPP refunded the overcharge to the patient per the patient's instruction by crediting her credit card. The allegation is that FPP's Executive Director, Peggy Moser, instructed the staff to put the same charge on some other account—the inference being that by overcharging another patient, FPP would recover the dollar amount it had credited to the initial patient who had been overcharged originally. Ms. Auman's testimony regarding this incident is recounted below.

Q:     And do you recall the specifics of that situation?

A:     Joan Snook came upstairs and told us that there was a problem with billing in Selinsgrove. There was a mistake made and when she told Peggy [Moser] about it Peggy said to put it on someone else's bill. Jean made note of it on the white board. She had the initials "JF" and fraud written underneath it with a circle and the date. I do not recall the date.

Q:     I'm sorry, Jean wrote "JF" fraud—

A:     yes.

Q:     ---on a white board?

A:     On a white board.

Q:     And you believe Jean wrote that in response to something that Joan Snook told you about something that Peggy Moser said?

A:     Jean said we needed to remember that day—that date 'cause it wasn't right.

---

[2] Plaintiff has averred that the overcharge involved amounted to $69.00. The FPP employees deposed testified consistently that the correct dollar amount involved is $65.00.

11

Q: Did Peggy tell you anything about the alleged improper billing?

A: I do not recall.

Q: And did Joan mention the $69 number?

A: Yes.....

Q: Now, did you raise any issue regarding this alleged over-billing to anyone?

A: No, sir.

Q: Do you recall when Joan Snook told you and Jean about the over-billing?

A: No, sir, I do not recall.

Q: And who else was there at the time?

A: Jean Flournoy and I.

Q: After that conversation did you hear anything more about this alleged $69 bill?

A: Not that I recall.

Q: Did you ever come to find out what was the cause of that $69—alleged $69 over-bill?

A: No, sir.

Q: And did you ever talk to Peggy Moser about that issue?

A: Not that I recall.

Q: Did you talk to anybody else about that issue.

A: Not that I recall.

[Auman deposition, pp. 23—25].

"The Whistleblower Law provides a civil cause of action to employees for violations of its provisions. To prove a cause of action for wrongful discharge under the Whistleblower Law, the plaintiff must show both a protected report of wrongdoing or

12

waste and a causal connection between that report and the discharge." *Evans v. Thomas Jefferson University*, 81 A.3d 1962, 1064 (Pa.Cmwlth.2013) (citations omitted). "The causal connection that the Whistleblower Law requires must be demonstrated by 'concrete facts or surrounding circumstances that the report of wrongdoing or waste led to the plaintiff's dismissal, such as that there was specific direction or information received not to file the report or that there would be adverse consequences because the report was filed.'" *Id.*, at 1070, citing *Golaschevsky v. Department of Environmental Resources*, 720 A.2d 757, 758 (Pa.1998). The Whistleblower Law "is not designed to provide insurance against discharge or discipline for an employee who informs on every peccadillo of his fellow employees." *Golschevsky v. Department of Environmental Resources*, 683 A.2d 1299, 1304 (Pa.Cmwlth.1996), *aff'd* 720 A.2d 757 (Pa. 1998). The burden shifts to the defendant to show a separate and legitimate reason for its actions only where plaintiff has satisfied the threshold showing of a causal connection. *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa.2001). "[V]ague and inconclusive circumstantial evidence" is insufficient to satisfy that threshold burden to show a causal connection and shift the burden to the defendant to justify its actions. *Evans v. Thomas Jefferson Hospital, supra* at 1070 (citations omitted).

Having reviewed the record submitted to the Court in support of and opposing the instant motion, we must conclude that Plaintiff has not made a *prima facie* showing of a violation of the Law. First of all, Plaintiff's own testimony leads to the conclusion that Plaintiff never made a report, formally or informally, of the events and incidents detailed herein to her employer. By her own admissions, Plaintiff never voiced any of her concerns to the Executive Director of FFP, Peggy Moser or to the Assistant

13

Director, Lisa Hepner Wehr. Plaintiff's own testimony establishes that the <u>only</u> person she spoke to about her questions regarding these incidents and events was Jean Flournoy—a co-worker. While Plaintiff's counsel may represent to this Court that for all intents and purposes Jean Flournoy was Plaintiff's supervisor, Plaintiff's own testimony dispels counsel's contention. Plaintiff clearly stated that Jean Flournoy did not have any supervisory duties over her.

Other than the conversation with Jean Flournoy in January 2013 regarding Dr. Levine's name appearing on billing software, Plaintiff cannot establish a time frame for any other incident and thus cannot even establish a temporal connection between the incidents and events at issue and her termination. Moreover, Plaintiff had no knowledge whether her supervisor, Peggy Moser (the individual who actually terminated Plaintiff) actually knew of Plaintiff's questions and concerns about the incidents and events which Plaintiff asserts lead to her firing. Plaintiff's assertion that Jean Flournoy had to have told Peggy Moser about Plaintiff's complaints because "Jean talked to everyone about everyone's business" constitutes "vague and inconclusive circumstantial evidence" which cannot satisfy Plaintiff's burden to produce at this point in the action "evidence of facts essential to her cause."

In order to qualify as a "whistleblower" under the statute, Plaintiff must be a "person who witnesses or has evidence of wrongdoing or waste while employed and who makes a <u>good faith report</u> of the wrongdoing or waste, verbally in writing, to one of the person's superiors..." 43 P.S. § 1422. It would appear from Plaintiff's own testimony that she did not make reports of any kind to her superiors. On the contrary,

14

her own testimony shows that she merely asked questions of a co-worker, nothing more.

In addition, the statute requires that a person make a good faith report of wrongdoing or waste. The statute defines "wrongdoing" as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision, ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." Plaintiff does not identify in her pleadings or in her response to the instant motion the Federal or State statute or regulation, ordinance, regulation, or code of conduct or ethics supposedly violated by anyone affiliated with or employed by FPP. Even if we were to construe Plaintiff's allegations regarding the appearance of Dr. Levine's name on software after December 2012 as "wrongdoing", Plaintiff has not submitted any evidence to support that this occurrence violated any statute, regulation, code of conduct or ethics. Plaintiff has not submitted any evidence that Dr. Levine saw FPP patients/clients after December 31, 2012 or that he and/or FPP billed for professional services rendered by him after December 31, 2012. Plaintiff has not submitted any evidence to rebut the information indicated in Defendant's Exhibit "B" attached to its Motion which is correspondence from the Pennsylvania Department of Public Welfare, Office of Medical Assistance Programs dated February 12, 2013 which states that the enrollment of Dr. Glenn S. Sherman "as a medical provider under programs administered by ...(DPW) has been approved" effective November 1, 2012. Plaintiff admitted in her deposition that Dr. Sherman did replace Dr. Levine as FPP's medical director. As to the allegation regarding Dr. Levine, Plaintiff has not met her burden in order to go forward.

15

Regarding the allegation of "improper billing practices", Plaintiff testified that she could not recall the specifics and that she simply questioned billing practices. Plaintiff has not submitted in response to the instant motion specific instances of improper billing which would support an allegation of "waste" of public funds or resources. Therefore, all we are left with is an unsupported allegation which is insufficient to survive summary judgment.

Plaintiff has also alleged wrongdoing and waste based upon an alleged practice by the clinic to sell "free" samples of a contraceptive device, NuvaRing. Plaintiff's testimony is that she "questioned" the practice because the samples are marked "not for resale."

Plaintiff attached to her response to the Motion copies of several depositions, including the deposition of Lisa Hepner Wehr. Ms. Wehr is FPP's former program director and currently serves as its Assistant Director. In her deposition, Ms. Wehr explained that the NuvaRing is a contraceptive device. The clinic does receive free samples of the device which it saves for distribution to patients/clients who are eligible for free services. Ms. Wehr testified regarding <u>one</u> incident in which a patient/client requested a device but did not qualify for free services. The center had run out of the devices designated for sale. The center had two options. It could have written a prescription for the device so the patient/client could purchase the device from a retail pharmacy at a high price or it could "sell" a free sample to the patient/client at a reduced price and then replace the free sample with a device from its restocked inventory. The center chose the latter option. According to Ms. Wehr's testimony (submitted incident to this motion by <u>Plaintiff</u>), the clinic chose to sell the device to the patient at a reduced

16

price and then did replace the free sample with a device from its resale inventory. Plaintiff has not submitted any evidence to establish that this practice violated a statute or regulation, code of conduct or ethics. Plaintiff has not submitted any evidence to rebut Ms. Wehr's testimony about this one incident. Plaintiff has not submitted any testimony that she reported her concerns to Ms. Moser, Ms. Wehr and/or Drs. Levine or Sherman. Plaintiff has not submitted any testimony to establish a time frame when she would have questioned this practice to her co-worker, Jean Flournoy. As a result, we must conclude that Plaintiff has not met her initial evidentiary burden to survive summary judgment.

Plaintiff alleges that FPP engaged in waste and wrongdoing by improperly billing patients/ clients' private insurance carriers for "free" services provided by DPW's Sexually Transmitted Disease [STD] program. Exhibit "D" attached to Defendant's Motion sets out the payment provisions and guidelines established by DPW pertaining to the STD program. This document states in pertinent part: "The Provider[3] **shall seek reimbursement from all other federal and state programs which the client may be eligible and all third party payers including, but not limited to private insurers before billing the Department.** If the payment provided by another payer is, by law or agreement, accepted by the Provider as payment in full..., the Provider shall not bill the Department or client for services provided to the client." We read this language to corroborate the testimony of multiple witnesses employed with FPP that as far as the STD program was concerned, DPW was the payor of last resort. It is clear from Exhibit "D" that the clinic's practice of asking STD clients if FPP could bill their private insurance

---

[3] We note that Ms. Wehr explained that the "Provider" could be the laboratory performing the STD analysis or FPP which would be paid for an office visit.

17

for testing and services was in compliance with DPW guidelines. Therefore, Plaintiff cannot establish any waste or wrongdoing that would support a Whistleblower claim.

Finally, the last allegation of waste and wrongdoing stems from the "overcharge" incident. We have reproduced Plaintiff's deposition testimony regarding this incident in pages 11 and 12 of this Opinion. In her testimony, Plaintiff describes her <u>observations</u> of the verbal exchange between two employees—Joan Snook and Jane Flournoy. Glaringly missing from Plaintiff's testimony is any evidence that Plaintiff <u>reported</u> or was about to report her observations to anyone in authority at FPP. In order to invoke the protections of the Whistleblower statute, one has to first qualify as a "whistleblower"— that is, one has to be a "person...who makes a good faith report of the wrongdoing or waste..." By her own admission, Plaintiff did not raise the issue regarding the alleged overbilling to anyone nor could she recall if she ever spoke of it to anyone at FPP including the Executive Director, Peggy Moser.

Therefore, based upon our review of the record in the light most favorable to Plaintiff, we must conclude that Plaintiff's claim is woefully lacking in factual proof. Without making any credibility determinations of any nature, Plaintiff has failed to produce evidence of facts that would establish that she made actual reports to her employer of the incidents at issue; that any of these alleged incidents constitute waste of public funds; or that FPP violated Federal or state statutes, regulations, ordinances, a code of conduct or ethics. Plaintiff, as the non-moving party, has failed to come forward with sufficient evidence essential to her cause of action. Accordingly, we will grant Defendant's Motion for Summary Judgment on Count I sounding in violations of the Whistleblower statute.

18

We will also grant Defendant the same relief and grant summary judgment in favor of Defendant as to Count II, as well, sounding in Wrongful Discharge. Count II of the Complaint incorporates by reference the allegations averred in Count I. Count II does not aver any factual allegations exclusive of the allegations pleaded in the "Whistleblower" count of the Complaint. Paragraphs 50 and 51 of the Complaint simply recite language from case authority stating the exceptions to the "at will" employment doctrine. Clearly, Count II of the Complaint is based solely on the allegations averred in Count I. Since we have concluded that Plaintiff has not met her evidentiary burden to survive summary judgment as to Count I, it follows that we must reach the same conclusion regarding Count II of the Complaint. Therefore, we will grant summary judgment as to Count II as well.

Accordingly, Defendant's Motion for Summary Judgment is GRANTED. Plaintiff's Complaint is dismissed with prejudice. This matter is removed from the list of civil matters scheduled for jury selection on April 27 and 28, 2015. This matter is no longer scheduled for jury trial on May 5, 6, 7, 2015.

BY THE COURT:

_____
MICHAEL H. SHOLLEY, J.

cc: Timothy M. Kolman, Esquire
N. Randall Sees, Esquire
Mary F. Leshinskie, Esquire
Deputy Court Administrator
Administrative Assistant

19