2023 PA Super 170

| | | |
|---|---|---|
| BOBBI JO SINORACKI, INDIVIDUALLY, AS THE ADMINISTRATRIX OF THE ESTATE OF DAVID SINORACKI, DEC'D, AND AS PARENT AND NATURAL GUARDIAN OF D.S., A MINOR, MADISON SINORACKI, AND MEGAN SINORACKI | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | No. 1064 MDA 2022 |
| v. | : : : | |
| THE CHILDREN'S SERVICE CENTER OF WYOMING VALLEY, KIDSPEACE, KIDSPEACE CHILDREN'S HOSPITAL, INC., KIDSPEACE CORPORATION, KIDSPEACE CORPORATION, KIDSPEACE NATIONAL CENTERS OF PA, INC., KIDSPEACE NATIONAL CENTERS, INC., KIDSPEACE NATIONAL CENTERS, INC., KIDSPEACE SERVICES, INC., KIDSPEACE PSYCHIATRIC HOSPITAL, MUHAMMAD A. KHAN, M.D. | : : : : : : : : : : : : : | |
| v. | : : : : | |
| DIANE HOCKENBERRY AND LEE HOCKENBERRY, INDIVIDUALLY AND AS PARENTS AND NATURAL GUARDIANS OF Z.H., A MINOR | : : : : | |

Appeal from the Order Entered June 21, 2022
In the Court of Common Pleas of Luzerne County
Civil Division at 2018-06389, 2018-10415

| | | |
|---|---|---|
| BOBBI JO SINORACKI, INDIVIDUALLY, AS THE ADMINISTRATRIX OF THE EST. OF DAVID SINORACKI, DEC'D, AND AS | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A20020-23

PARENT AND NATURAL GUARDIAN : 
OF D.S., A MINOR, M.S. AND M.S. : 
: 
           Appellant      :    No. 1065 MDA 2022
: 
                 v.           : 
: 
: 
DIANE AND LEE HOCKENBERRY, : 
INDIVIDUALLY AND AS PARENTS : 
AND NATURAL GUARDIANS OF Z.H., : 
A MINOR

Appeal from the Order Entered June 21, 2022
In the Court of Common Pleas of Luzerne County
Civil Division at 2018-06389

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.*

OPINION BY MURRAY, J.:            **FILED SEPTEMBER 19, 2023**

In these consolidated appeals, Bobbi Jo Sinoracki, individually and as administratrix of the estate of David Sinoracki, and as parent/guardian of D.S., Madison Sinoracki, and Megan Sinoracki (Appellant), appeals from the orders respectively granting (1) the motion for judgment on the pleadings filed by Children's Service Center of Wyoming Valley (CSC or Center); and (2) the motion for summary judgment filed by CSC employee Muhammad A. Khan, M.D. (Dr. Khan).[1]  After careful consideration, we affirm.

The trial court thoroughly detailed the underlying facts as follows:

---

* Former Justice specially assigned to the Superior Court.

[1] We collectively refer to Dr. Khan and CSC as Defendants.

- 2 -

At a young age, Z.H. was diagnosed with an inoperable arteriovenous malformation ("AVM") in the left occipital region of his brain. An AVM is an abnormal tangle of arteries and veins that can develop in the brain and cause neuropsychological disturbances, including schizophrenic and erratic psychotic behavior. Since his diagnosis, Z.H.'s AVM increased in size, causing vision problems, increased headaches, and pain.

The assistance of CSC was sought as Z.H.'s behavior became increasingly erratic and aggressive. CSC operates a pediatric mental and behavioral health practice and offers walk-in, telephonic, and mobile crisis intervention services. Throughout his treatment with CSC[, Z.H.'s] providers diagnosed him with attention deficit/hyperactivity disorder and oppositional-defiant disorder.

On August 25, 2014, Z.H. had an initial evaluation with CSC by Paul Termini, M.D., who noted that Z.H. had increasing behavioral disturbances which included substance abuse, school suspensions, self-injurious behavior, and physical assaults. Dr. Termini further noted concerns of ongoing anger issues.

On February 20, 2015, Z.H. underwent a second evaluation with CSC by Shiva Rezvan-Homami, PSA. Z.H.'s anger issues and substance abuse persisted. Concerns for the safety of [Z.H.'s] brother due to [Z.H.'s] aggressive behavior was noted.

On May 13, 2015, … Dr. Khan[], with CSC, became aware of Z.H.'s substance abuse and noted that Z.H. had anger outbursts at home and was destructive and combative. Dr. Khan frequently saw Z.H. and managed his medications throughout his treatment with CSC. On July 9, 2015, Dr. Khan noted no change in Z.H.'s behavior after beginning to take the antipsychotic, Abilify. It was noted that Z.H. made no connection between information he was given and that he did not pay attention.

On August 11, 2015, Z.H. presented to Geisinger [Medical Center,] where he admitted to drinking one half of a bottle of vodka by himself with the intention of harming himself and verbalized that he "didn't want to live anymore." Z.H. also explained that he had suicidal ideations when he drank. Further, Z.H. struck his head repeatedly[,] which could have resulted in severe injury or death due to his AVM. Consequently, Geisinger

noted suicidal ideations.

On August 17, 2015, Z.H. had a third psychological evaluation with Dr. Rezvan-Homami, who noted continued behavioral disturbances, continued suicidal ideations, self-injurious conduct, increased and severe aggression, paranoia, and anger. Dr. Rezvan-Homami further noted that "it was a miracle that [Z.H.] has not been hospitalized, has not been sent to rehab, or arrested."

On August 22, 2016, Z.H. presented to CSC and was seen by Dr. Khan[,] who noted that Z.H. has been completely off his medication since January, 2016, was not going to school and was isolating himself, not eating, and very depressed, still abusing substances, and angry. Z.H. also showed signs of paranoia, thinking people were after him, and schizophrenia, by talking to himself. It was further noted that his insight and judgment were poor. Abilify was prescribed.

On August 23, 2016, Z.H. threatened to kill his father. Z.H.'s parents called the police, who forcibly restrained Z.H. and brought him back to Geisinger for evaluation, bagged with a "spit hood" and handcuffed due to his aggressive behavior. On presentation to the emergency department, security was called and Z.H. was placed in four-point restraints. While at Geisinger, Z.H.'s parents reported that he had been presenting with paranoia, mood swings, anger, and behavioral issues for three and a half days prior. They further reported delusions suffered by Z.H., some of which he had acted upon, such as him throwing up his medications because of a belief that his mother was poisoning him, paranoia about cars and trucks near his house in that he thought that someone was going to harm him, and a desire to kill his father because of a belief that his father was assaulting his mother. While at Geisinger, a CT scan was performed which showed that the AVM had steadily increased in size since 2008, but that there was no acute abnormality. … Additionally, in a discussion with Dr. Ichord, with the Children's Hospital of Philadelphia, Todd J. Holmes, M.D., with Geisinger, was told that Z.H. should be treated like "any brain injured patient with neuropsychiatric manifestation."

Later the same day, Z.H. was transferred to KidsPeace for homicidal ideations and paranoia. While there, his psychiatrist was Mahmoud Elfatah, M.D. Z.H. reported that a [J]eep stopped

in front of his house and he threw rocks to attack it because he felt someone was after him. The psychiatric evaluation revealed that Z.H. had punched his brother and had anger problems, [and] had markedly impaired insight and judgment. Dr. Elfatah also noted that Z.H. was increasingly suspicious and paranoid and attributed it to Z.H.'s marijuana use. Z.H. was refusing to stay and aggressively pushed through several staff members and was slamming his body against the door. Z.H. was continually aggressive towards the staff members and had even assaulted another patient by punching him without provocation. Z.H. was restrained at one point and was placed in a safe room. During his stay[,] Dr. Elfatah changed Z.H.'s medication from Abilify to Seroquel, another anti-psychotic medication. On August 25, 2016, Dr. Elfatah and others discharged Z.H. to Family Based Services at CSC after determining that Z.H. no longer displayed homicidal ideation.

On August 26, 2016, Z.H. was [riding in the front passenger's seat of] his mother['s vehicle when he] grabbed the steering wheel and drove into oncoming traffic[,] crashing the car because he believed someone was watching him. Z.H.'s parents immediately sought to have him readmitted to KidsPeace that same day. His mother further reported that he had run into traffic attempting to harm himself. Z.H. was readmitted for homicidal ideations, paranoia, and explosive behaviors. Z.H. was refusing medication, had increasing paranoia, made threats, and continued to express the belief that he was being poisoned by his mother and that others were watching him. Dr. Elfatah noted that Z.H. was "floridly psychotic," that Z.H.'s AVM had neurocognitive effects, and that Z.H. had recently received a "grim report" regarding the prognosis of his medical condition and [the report] coincided with his increasingly reckless behavior. As a result of Dr. Elfatah's evaluation[,] Z.H. was diagnosed with mood dysregulation disorder, cannabis-induced psychotic disorder, and cannabis use disorder. Z.H. was rated a low risk on the homicide risk assessment score.

On August 29, 2016, while Z.H. was still at KidsPeace, Katie Lennon, Z.H.'s social worker, noted that Z.H. was struggling to adjust to the program and demonstrated noncompliance with following basic rules and expectations. He was determined to not be ready for family interaction. He was highly anxious, easily agitated, and disorganized in his thoughts. On September 1, 2016, Z.H.'s parents visited him for a family session. He became

angry and threw a chair against a wall and broke a toilet paper dispenser. Z.H. continued to display worsening behavior and limited signs of improvement for the duration of his fourteen-day admission. …

In [Z.H.'s] discharge summary, completed by Andrew Clark, M.D., it was believed that the neuropsychiatric implications of Z.H.'s AVM and marijuana use were difficult to discern. His prognosis was fair and it was noted that his AVM was a significant stressor and that further drug use interacting with his AVM risked his psychiatric stability. Ms. Lennon, at one point during the discharge process, instructed Z.H.'s parents to follow an "emergency crisis plan" and to attempt to persuade Z.H. to "use coping skills to manage the situation and maintain safety," such as taking a 5-minute break, reading, listening to music, … and remaining positive. Z.H. was ultimately discharged home.

On September 8, 2016, the night of his discharge, Z.H. stayed awake all night and sat on his front porch due to paranoia that someone was going to hurt him or his family. On September 9 and 10, 2016, Z.H.'s parents continuously called KidsPeace and CSC, advising them of Z.H.'s continued behavior. Ms. Lennon noted that she spoke with Z.H.'s mother and that Z.H. had again been aggressive towards [Z.H.'s] father and made threats towards him again. She further noted that Z.H. was awake until 6 AM sitting on the front porch with a pile of rocks "feeling like someone was going to come to the house and harm them." He was also noted to be difficult to deescalate and was refusing to attend his therapy appointments. The recommendation was to proceed to the visits at CSC.

Z.H.'s mother took him to CSC [on September 10, 2016,] to see Dr. Khan. Dr. Khan knew that Z.H. had been admitted twice to KidsPeace and of the [August 26, 2016,] car incident that took place between admissions …. Dr. Khan was also aware that Z.H. was smoking marijuana, acting "bizarrely," had cognitive impairment as a result of his AVM, that he was admitted to KidsPeace a second time for increasing paranoia and aggression, that Z.H.'s medication had been recently switched from Abilify to Seroquel, and that he stayed awake all night with a pile of rocks ready to protect himself and his family.

Following this visit, Z.H.'s parents continued to call KidsPeace and CSC, including CSC's crisis intervention services.

On September 10, 2016, a counselor with CSC spoke with Z.H.'s mother and provided several options on how to address her concerns. The counselor advised that she would come to the house to respond to the crisis the following day.

At no time from discharge on September 8, 2016 to September 11, 2016 did CSC or KidsPeace, or their agents and/or employees consider or pursue involuntary commitment of Z.H.

On September 11, 2016, Z.H.'s father saw his son leave the front porch and driveway moments before … Z.H. entered the Sinoracki family's home and violently assaulted Bobbi Jo, Megan, and David [Sinoracki] with a kitchen steak knife. … Shortly thereafter, Z.H.'s father entered the Sinoracki family's home and forcibly restrained [Z.H.] on a chair in the living room. The police responded to the scene and took Z.H. into custody. Ultimately, David Sinoracki succumbed to his injuries.

Trial Court Opinion, 11/4/22, at 1-7 (some capitalization modified).

Appellant initiated this negligence action against Defendants (and other parties not relevant to this appeal), by writ of summons filed September 7, 2018. Appellant filed a complaint on December 18, 2018. CSC filed an answer on January 21, 2019. On October 10, 2019, CSC filed a motion for judgment on the pleadings. The trial court granted CSC's motion on July 10, 2020. On February 23, 2022, following discovery, Dr. Khan filed a motion for summary judgment. The trial court granted Dr. Khan's motion on April 20, 2022.

On June 21, 2022, Appellant filed a "Praecipe to Mark Settled, Discontinued, and Ended," regarding Appellant's claims against the remaining

Defendants.[2]  This timely appeal followed.  Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents two issues for review:

1. Did the trial court err in dismissing [Appellant's] negligence claims against Dr. Khan on the ground that he owed no duty applicable to this case under common law, where the record establishes that Dr. Khan undertook to provide medical professional services to [Z.H.] for the protection of others, both generally and as relates to [Appellant], and therefore Dr. Khan undertook a corresponding duty of care under Pennsylvania law?

2. Did the trial court err in dismissing [Appellant's] negligence claims against the Center on the ground that it owed no duty applicable to this case under common law, where the complaint alleges that the Center undertook to provide professional services to [Z.H.] for the protection of others, both generally and as relates to [Appellant], and therefore the Center undertook a corresponding duty of care under Pennsylvania law?

Appellant's Brief at 4.

Preliminarily, we note Appellant's brief does not comply with Pa.R.A.P. 2119(a), which requires the argument section

> be divided into as many parts as there are questions to be argued; and shall have at the head of each part - in distinctive type … - the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

*Id.*  Appellant's argument headings do not correspond to the issues. Nonetheless, we overlook the defect and address Appellant's issues together.

___

[2] "A *praecipe* to discontinue constitutes a final judgment." ***Levitt v. Patrick***, 976 A.2d 581, 587 (Pa. Super. 2009) (citation and brackets omitted).

Appellant claims she established that Defendants owed the Sinoracki family a duty of reasonable care, and thus the trial court erred in granting Dr. Khan's motion for summary judgment and CSC's motion for judgment on the pleadings. *See* Appellant's Brief at 22-69.

In reviewing the grant of summary judgment, we recognize:

[S]ummary judgment is only appropriate in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). When considering a motion for summary judgment, the trial court must take all facts of record[,] and reasonable inferences therefrom[,] in a light most favorable to the non-moving party[,] and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. Because the claim regarding whether there are genuine issues of material fact is a question of law, our standard of review is *de novo* and our scope of review is plenary.

*Nicolaou v. Martin*, 195 A.3d 880, 891-92 (Pa. 2018) (some citations omitted). "Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment." *Straw v. Fair*, 187 A.3d 966, 982 (Pa. Super. 2018) (citation omitted).

As to judgment on the pleadings:

Entry of judgment on the pleadings is permitted under Pennsylvania Rule of Civil Procedure 1034, which provides that "after the pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for judgment on the pleadings." Pa.R.C.P. 1034(a). A motion for judgment on the pleadings is similar to a demurrer. It may be entered when there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law.

Appellate review of an order granting a motion for judgment on the pleadings is plenary. The appellate court will apply the

same standard employed by the trial court. A trial court must confine its consideration to the pleadings and relevant documents. The court must accept as true all well pleaded statements of fact, admissions, and any documents properly attached to the pleadings presented by the party against whom the motion is filed, considering only those facts which were specifically admitted.

We will affirm the grant of such a motion only when the moving party's right to succeed is certain and the case is so free from doubt that the trial would clearly be a fruitless exercise.

*Kote v. Bank of N.Y. Mellon*, 169 A.3d 1103, 1107 (Pa. Super. 2017) (citation omitted).

The crux of this appeal is whether Defendants owed a duty to the Sinoracki family. This issue presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary. *Maas v. UPMC Presbyterian Shadyside*, 234 A.3d 427, 436 (Pa. 2020).

Appellant argues:

Under Pennsylvania law, when a physician voluntarily undertakes to act within the doctor-patient relationship for the protection of a non-patient third party, the physician assumes a corresponding duty of reasonable care to **any third party who is within the orbit of harm**.

Appellant's Brief at 22 (emphasis added) (citing *DiMarco v. Lynch Homes-Chester County, Inc.*, 583 A.2d 422, 425 (Pa . 1990)). According to Appellant,

Dr. Khan and the Center voluntarily undertook to act for the protection of [Z.H.] and others within his orbit of harm when treating [Z.H.] for his homicidal ideations and the Defendants thereby assumed a duty to act reasonably within the scope of that undertaking.

- 10 -

Appellant's Reply Brief at 1-2; *see also* Appellant's Brief at 54 (claiming Defendants' "undertaking with respect to [Z.H.] summoned a duty to act for the protection of everyone within [Z.H.'s] orbit of harm – including the Sinoracki family….").

Appellant further asserts there is a

long-tenured principle of Pennsylvania law that the voluntary choice to undertake obligations within the context of medical treatment for another's protection brings forward the duty of reasonable care applicable not just to a patient but to third parties as well.

*Id.* at 36. In support, Appellant relies primarily on *DiMarco*, *supra*, as well as *Matharu v. Muir*, 86 A.3d 250 (Pa. Super. 2014) (*en banc*), and *Troxel v. A.I. Dupont Inst.*, 675 A.2d 314 (Pa. Super. 1996). *See* Appellant's Brief at 30-36, 54; Appellant's Reply Brief at 12.

Appellant recognizes that the "record evidence established [Z.H.] posed an imminent threat of harm and homicide to people around him, but he had not explicitly threatened the Sinoracki family…." Appellant's Brief at 45. However, Appellant claims:

The record establishes Dr. Khan actually knew or should have known that the possibility [Z.H.] would hurt others was not merely theoretical, and that [Z.H.] posed a demonstrated risk of harm to persons near him when experiencing paranoia-driven symptoms. Indeed, [Z.H.'s] violent and paranoid actions known to Dr. Khan obviously represented a danger not just to [Z.H.,] but to anyone in [Z.H.'s] immediate orbit wherever [Z.H.] happened to be. Those non-patients included [Z.H.'s] … neighbors as evidenced by [Z.H.'s] pattern of sitting outside his house with a pile of rocks nearby.

*Id.* at 53-54. Appellant asserts, "In these circumstances, the appropriate course of action involved [Z.H.'s] hospitalization and other type of management…." *Id.* at 45; *see also* Appellant's Reply Brief at 15 ("Defendants … breach[ed their] duty when they failed to hospitalize [Z.H.] and pursue other treatment as his mental condition devolved.").

Defendants argue the trial court did not err because Appellant failed to establish they owed a duty of care to the Sinoracki family.[3] According to Defendants, *DiMarco*, *Matharu*, and *Troxel* are distinguishable and unavailing. CSC Brief at 17-22; Dr. Khan Brief at 13-17; *Amicus* Brief at 9-14. Defendants claim Appellant's proposed duty of care is not supported by precedent, and its scope is not limited to reasonably foreseeable harm. CSC Brief at 22-27; Dr. Khan Brief at 5 (stating Appellant "seek[s] the creation of a new, never-before-imposed duty on mental health providers to protect third parties from harm by their patients," which "would stretch foreseeability concepts beyond all limits…." (quotation marks omitted)); *Amicus* Brief at 15 ("[Appellant's] proposed duty … has no limits, and would exist anytime a patient under treatment for mental illness harms anyone.").

The Pennsylvania Supreme Court has stated that *Emerich v. Philadelphia Ctr. for Human Dev.*, 720 A.2d 1032 (Pa. 1998), is the "seminal case setting forth a mental health professional's duty to warn third

---

[3] The American Medical Association and the Pennsylvania Medical Society have filed a brief advocating on behalf of Defendants (*Amicus* Brief).

parties." *Maas*, 234 A.3d at 437. The *Emerich* Court "concluded the special relationship between a patient and mental health professional may, in limited circumstances, give rise to an affirmative duty to warn a third party of potential harm caused by his patient." *Id.* at 437–38 (citation omitted). Pertinently:

> The facts underlying *Emerich* were that, in the space of thirty minutes, a psychiatric patient (Joseph) told his therapist he was going to kill his former girlfriend, identified by Joseph and known to the therapist as Teresa Hausler. The therapist immediately advised Hausler to stay away from Joseph, without specifically telling her he planned to kill her. Hausler ignored the therapist's warning to stay away and Joseph shot her to death. Ultimately, the *Emerich* Court determined the therapist had a duty to warn Hausler, satisfied the duty by telling her to stay away, and affirmed the dismissal of the case on summary judgment. *Emerich*, 720 A.2d at 1045. The Court summarized its holding as follows:
>
>> [I]n Pennsylvania, based upon the special relationship between a mental health professional and his patient, when the patient has communicated to the professional a specific and immediate threat of serious bodily injury against a specifically identified or readily identifiable third party and when the professional, determines, or should determine under the standards of the mental health profession, that his patient presents a serious danger of violence to the third party, then the professional bears a duty to exercise reasonable care to protect by warning the third party against such danger.
>
> *Id.* at 1043.
>
> The *Emerich* Court began its legal analysis by observing the general common-law rule stating there is no duty to control the conduct of a third party to protect another from harm. *Emerich*, 720 A.2d at 1036. *Emerich* recognized an exception to that rule: "where a defendant stands in some special relationship with either the person whose conduct needs to be controlled or in a relationship with the intended victim of the conduct, which gives

- 13 -

to the intended victim a right to protection." *Id.* (*citing* Restatement (Second) of Torts § 315 (1965)). Relying in part on *Tarasoff* [*v. Regents of Univ. of California*, 551 P.2d 334, 340 (Cal. 1976)], the *Emerich* Court concluded the special relationship between a patient and mental health professional may, in limited circumstances, give rise to an affirmative duty to warn a third party of potential harm caused by his patient. *Id.* at 1037.

In *Tarasoff*, … the patient did not expressly identify his threatened victim by name, but from the context of the threat, the therapist could "readily identify" who she was. *Emerich*, 720 A.2d at 1036. The *Emerich* Court explained *Tarasoff* recognized a duty to "protect" a readily identifiable third party from the violent acts of a patient, and that "a duty to warn is subsumed in this broader concept of a duty to protect." *Emerich*, 720 A.2d at 1037 n.5. "'The discharge of this duty may require the therapist to take one or more of various steps, depending on the nature of the case. Thus, it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.'" *Id., quoting Tarasoff*, 551 P.2d at 340. The *Emerich* Court addressed the issue of duty only "in the context of a duty to warn[,]" and left for another day whether "some broader duty to protect" should be recognized. *Id.* Specifically regarding the duty to warn, the *Emerich* Court stated: "We find, in accord with *Tarasoff*, that a mental health professional who determines, or under the standards of the mental health profession, should have determined, that his patient presents a serious danger of violence to another, bears a duty to exercise reasonable care to protect by warning the intended victim against such danger." *Emerich*, 720 A.2d at 1040.

Notably, the *Emerich* Court further held "the circumstances in which a duty to warn a third party arises are extremely limited." *Id.* at 1040. Before the therapist's duty is triggered, the patient must communicate a "specific and immediate threat" against "a **specifically identified or readily identifiable victim**." *Id.* [(emphasis added).] … The *Emerich* Court noted, "as a practical matter, a mental health care professional would have great difficulty in warning the public at large of a threat against an unidentified person. Even if possible, warnings to the general public would produce a cacophony of warnings that by reason of

- 14 -

their sheer volume would add little to the effective protection of the public." *Id.* at 1041 [(citation and quotations omitted).]

*Maas*, 234 A.3d at 437-38 (footnote omitted).

In *Maas*, the Pennsylvania Supreme Court affirmed the denial of a motion for summary judgment filed by mental health treatment providers. The mental health patient in *Maas* had lived in a forty-unit apartment building and repeatedly told his doctors and therapists he would kill an unnamed "neighbor." *Id.* at 429. The patient "ultimately carried out his threat, killing an individual who lived in his building, a few doors away from his own apartment." *Id.* The victim's mother initiated a wrongful death action against the providers. *Id.* The providers sought summary judgment on the basis that they had no duty to warn about the threats because the patient never "expressly identified a specific victim." *Id.* In affirming the denial of summary judgment, the Supreme Court observed the providers'

> core contention … is that the "neighbors" against whom [the patient] articulated murderous threats were not an enumerated and readily identifiable group of [apartment] residents, but instead, consisted of a large, amorphous, unidentifiable group of the public at large.

*Id.* at 438-39. The Court explained:

> [T]he duty to warn applies not only when a specific threat is made against a single readily identifiable individual, but also when the potential targets are readily identifiable because they are members of a specific and identified group — in this case, "neighbors" residing in the patient's apartment building. In these circumstances, the potential targets are not a large amorphous group of the public in general, but a smaller, finite, and relatively homogenous group united by a common circumstance.

- 15 -

*Id.* at 439.

Mindful of the above authority, we address the cases on which Appellant relies. In ***DiMarco***, our Supreme Court considered

> whether a physician owes a duty of care to a third party where the physician fails to properly advise a patient who has been exposed to a communicable disease, and the patient, relying upon the advice, spreads the disease to a third party.

***DiMarco***, 583 A.2d at 423. The medical professionals in ***DiMarco*** gave a patient incorrect medical advice about whether she had Hepatitis B, a sexually transmitted disease, and she subsequently transmitted the disease to plaintiff, her paramour. *Id.* Applying the Restatement (Second) of Torts § 324A,[4] the

---

[4] Section 324A provides:

**§ 324A Liability to Third Person for Negligent Performance of Undertaking**

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS, § 324A. This Court has stated: "To state a cause of action under Section 324A …, a plaintiff must aver that the physician
*(Footnote Continued Next Page)*

***DiMarco*** Court noted that for the patient to state a claim, the medical professionals must have undertaken "to render services to another which [they] should recognize as necessary for the protection of a third person," a principle the Court characterized as "essentially a requirement of foreseeability." ***DiMarco***, 583 A.2d at 424 (quoting ***Cantwell v. Allegheny Cty.***, 483 A.2d 1350, 1353-54 (Pa. 1984)).  The Court held:

> When a physician treats a patient who has been exposed to or who has contracted a … contagious disease, it is imperative that the physician give his or her patient the proper advice about preventing the spread of the disease.  … The patient must be advised to take certain sanitary measures….  Such precautions are … taken to safeguard the health of others.  Thus, the duty of a physician in such circumstances extends to those "within the foreseeable orbit of risk of harm." ***Doyle v. South Pittsburgh Water Co.***, … 199 A.2d 875, 878 ([Pa.] 1964).

***DiMarco***, 583 A.2d at 424 (emphasis and paragraph break omitted).

In ***Troxel***, the plaintiff's friend and the friend's baby had a contagious disease, cytomegalovirus (CMV).  ***Troxel***, 675 A.2d at 316.  Plaintiff frequently visited her friend and her friend's baby during plaintiff's pregnancy, unaware of the CMV.  ***Id.***  Plaintiff subsequently contracted CMV, and her baby died from CMV-related complications shortly after his birth.  ***Id.***  Plaintiff initiated a wrongful death and survival action against her friend's physicians (defendants) for failing to advise the friend about the contagious nature of

---

has undertaken to render services to another which he should recognize as necessary for the protection of a third person." ***Matharu***, 86 A.3d at 259 (citation and quotation marks omitted).

- 17 -

CMV. *Id.* This Court reversed the trial court's order granting summary judgment on the basis that defendants owed plaintiff no duty of care. *See id.* at 321-23. Citing *DiMarco*, this Court held,

> where [a] physician undertakes the treatment of a patient with a communicable or contagious disease[, they have] … a duty to correctly inform the patient about the contagious nature of the disease in order to prevent its spread to those who are within the foreseeable orbit of risk of harm.

*Id.* at 322; *see also id.* at 323 ("The standard of care for a physician who is treating a patient with a communicable disease is to inform the patient about the nature of the disease and its treatment, to treat the patient, and to inform the patient how to prevent the spread of the disease to others.").

Finally, in *Matharu*, an *en banc* panel of this Court held that the non-patient plaintiff stated a negligence claim against physicians (defendants) under Section 324A for failure to administer an injection to a patient/mother (Mother) for the protection of Mother's future, unborn children. *Matharu*, 86 A.3d at 260-61. We affirmed the trial court's denial of defendants' motion for summary judgment, holding:

> Section 324A of the Second Restatement continues to require physicians to provide reasonable care in the patient's treatment as is necessary for the protection of others, and establishes liability to certain third-parties when such reasonable care is lacking. As such, [plaintiffs'] claim that the failure to administer [the injection] during Mother's pregnancy … in 1998 resulted in the death of [a subsequent child] in 2005 states a claim under Section 324A….

*Matharu*, 86 A.3d at 260 (citation omitted). We concluded:

- 18 -

A physician-patient relationship existed between [defendants] and Mother, and the allegation that the failure to provide reasonable care within this relationship to protect certain **readily identifiable third parties** (including [Mother's future children]) adequately states a claim under Section 324A.

*Id.* (emphasis added).

Consistent with the foregoing, we agree with Defendants' assessment of *DiMarco*, *Troxel*, and *Matharu* as distinguishable and unavailing. Rather, we are persuaded by this Court's decision in *F.D.P. Ex Rel S.M.P. v. Ferrara*, 804 A.2d 1221 (Pa. Super. 2002). In *Ferrara*, the plaintiffs were parents of a child who had been sexually assaulted by a mentally ill neighbor (assailant). *Id.* at 1224. Plaintiffs appealed the trial court's dismissal of their negligence claims against the non-profit corporations (defendants) that provided medical treatment and housing to assailant. *Id.* at 1223-24. This Court affirmed the trial court's grant of defendants' preliminary objections based on defendants owing the plaintiffs no duty of care. *Id.* at 1228-29. We observed:

[Plaintiffs] invite us to apply the rationale in a line of cases imposing liability on a physician for failing to properly advise a patient who has a communicable disease when the patient relied upon the improper advice and spread the disease to a third party. *DiMarco v. Lynch Homes-Chester County, Inc.*, 525 Pa. 558, 583 A.2d 422 (1990); *Troxel v. A.I. Dupont Institute*, 450 Pa. Super. 71, 675 A.2d 314 (Pa. Super. 1996).

**Those cases [] are specifically limited to their circumstances** and impose liability due to the peculiar nature of communicable diseases, which involve a direct threat to public health. Under the reasoning employed in those cases, liability is premised upon the physician's awareness that his advice concerning the communicable disease is directly relevant to its spread to third parties. Thus, the duty is imposed because "it is imperative that the physician give his or her patient the proper

- 19 -

advice about preventing the spread of the disease." ***DiMarco***, 583 A.2d at 424. Moreover, those cases impose the duty pursuant to Restatement (Second) of Torts, § 324A, which relates to an actor who renders services under conditions where the actor should recognize that the services are necessary for the protection of a third person. Mental health services are provided for the protection of the patient. Furthermore, mental health patients do not have a disease that is communicable to the public nor do they present a peculiar threat to the public. The reasoning of those cases is not applicable herein.

***Ferrara***, 804 A.2d at 1229 (emphasis added).[5]

We further emphasized:

**Pennsylvania courts are reluctant to subject a person to liability for the acts of a third party in the absence of compelling circumstances**. Indeed, there are a number of cases significantly analogous to the present one where the courts have refused to impose such liability.

***Id.*** at 1230 (emphasis added); ***see also id.*** at 1230-31 (discussing caselaw).

Instantly, the trial court opined:

Z.H. never verbally or otherwise identified a concrete group of people to which [the Sinoracki family] may have been a part of, as the target of his threats. … [] Z.H. made a verbal threat to kill his father, was consistently reported to be aggressive, had driven his mother's car into traffic, and threw rocks at passing cars. … [I]f [Z.H.'s] threat were to be to any identifiable group including [the Sinoracki family,] it would be to the general public, including cars passing by. … [S]uch a group would not fall within the confines of a "readily identified third party," and so [Appellant's] claim relying on the application of a duty to warn must fail. … [T]here was nothing to suggest Z.H. was generally a threat to people beyond those in view and in his immediate environment. For example, concerning Z.H. sitting with rocks in front of his home, the record does not reflect that he was running after any vehicles or acting aggressively towards vehicles that did not pass by his home. Without a record reflecting [any basis for

---

[5] ***Matharu*** is distinguishable for the reasons expressed in ***Ferrara***.

Defendants] to predict that Z.H. would go out of his way to assault the Sinoracki family[,] … the court cannot find that Z.H.'s threats were against [the Sinoracki family] as a "readily identifiable group."

Trial Court Opinion, 11/4/22, at 18-19 (some capitalization modified).

The trial court's reasoning is supported by the record and law. ***See id.***; ***see also Maas***, 234 A.3d at 439 (limiting tort liability to "readily identifiable" "potential targets"). As Appellant failed to establish that Defendants owed the Sinoracki family a duty of care, we conclude the trial court did not err in granting Dr. Khan's motion for summary judgment and CSC's motion for judgment on the pleadings. ***See Ferrara***, ***supra***; ***Emerich***, 720 A.2d at 1036 (generally, there is no duty to control the conduct of a third party to protect another from harm); ***Troxel***, 675 A.2d at 321 ("without a finding of duty, the issue of breach of duty cannot be submitted to the jury.").

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/19/2023